

# Expert Report

**in connection with:**

# Water Pollution Control Authority of the City of Norwalk
**v**
# Flowserve US, Inc.
**v**
# Gilbane Building Company

Civil Action No. 3:14-cv-00549-VLB
United States District Court
District of Connecticut

**Phase I Upgrade**
**CM Role and Responsibilities**
**Norwalk Wastewater Treatment Plant**
**Norwalk, Connecticut**

**June 26, 2017**

Prepared by:

**Bradley D. Wolf**
**Managing Director**

**Berkeley Research Group**
Four PPG Place - 4th Floor
Pittsburgh, PA 15222
412.235.4070
bwolf@thinkbrg.com

Exhibit 20
Page 1 of 27

GILBANE BUILDING COMPANY
REPORT ON CM ROLE AND RESPONSIBILITIES

## TABLE OF CONTENTS

I.     INTRODUCTION ...............................................................................2

II.    ANALYSIS ......................................................................................4

III.   INFORMATION RELIED UPON ....................................................22

IV.   SIGNATURE .................................................................................23

APPENDICES ...........................................................................................24

     Appendix A - Curriculum Vitae of Bradley D. Wolf .......................24

GILBANE BUILDING COMPANY
REPORT ON CM ROLE AND RESPONSIBILITIES

## I.  INTRODUCTION

**Statement of Purpose**

I, Bradley Wolf of Berkeley Research Group ("BRG"), was retained by Hinckley, Allen & Snyder LLP, 20 Church Street, Hartford, CT 06103-1221, as counsel for Gilbane Building Company, ("Gilbane") to provide independent professional services in the matter concerning a dispute pertaining to warranty coverage raised by the Water Pollution Control Authority of the City of Norwalk, Connecticut ("WPCA").  Flowserve was the pump supplier on Phase 1 of the upgrade of the WPCA water treatment plant ("Project") which was designed by Camp Dresser and McKee ("CDM") and built under the management of Gilbane in the period 2009 to 2012.  Gilbane served in the role of construction manager ("CM") during the installation period. I was specifically requested to review and opine on certain reasonably expected duties, actions and responsibilities of CM acting on behalf of an owner like WPCA; including any obligations in the agreement between the parties and typical expectations within the industry.

The findings and opinions herein are based on my review of the available records and information that were provided to me as of the date of this report, a listing of which is included in Section IV.  I did discuss some of the information with selected Gilbane project participants.

All opinions expressed are to a reasonable degree of engineering and professional certainty based upon my knowledge and industry experience.  Should additional information be obtained subsequent to the date of this report, I reserve my rights to modify the analysis and opinions that are set forth below.

**Qualifications of Bradley D. Wolf, P.E.**

I am a Managing Director at Berkeley Research Group located in Pittsburgh, PA.  I earned my Bachelor of Science Degree in Metallurgy and Materials Engineering from Lehigh University.  I have over 40 years of industrial construction experience as an owner, equipment supplier and a

2

Exhibit 20
Page 3 of 27

GILBANE BUILDING COMPANY
REPORT ON CM ROLE AND RESPONSIBILITIES

contractor and have hands on experience in the water and wastewater treatment industry while working for an international water company. I am a PA licensed Professional Engineer, a member of the American Society of Safety Engineers and a past board member of both the Cleveland and Western Pennsylvania engineering societies.   I am also a current member of the Executive Committee of the International Water Conference®, where I have been recognized with its annual Merit Award and have twice served as the General Chair of the annual water conference.  My Curriculum Vitae is attached as Appendix A to this report.  I am paid for my services on an hourly basis at the rate of $400/hour.  I was assisted by my BRG staff, primarily Mr. James Bolas, a Senior Managing Consultant, who is also retained on an hourly basis at the rate of $300/hour.  For any other upcoming services in this case, including testimony, my rate will remain unchanged at $400/hour.   Until my retention I had no knowledge of the dispute or the legal case.

Exhibit 20
Page 4 of 27

GILBANE BUILDING COMPANY
REPORT ON CM ROLE AND RESPONSIBILITIES

## II.  ANALYSIS

### A.  Gilbane's Role and Responsibilities

On June 25, 2009, WPCA and Gilbane executed the "Agreement" wherein Gilbane agreed to provide CM services for the Phase 1 upgrade of the WPCA's water treatment plant ("WWT") in Norwalk, Connecticut.  The timing of the execution apparently coincided with the completion of the Preconstruction Services and Vendor Bidding process as is evident in the project  schedule which was included as Exhibit C to the Agreement.  While the Agreement spells out the typical responsibilities for a CM relationship, it also envisions a possible evolution of the Contract Amount (Article 5) to a possible Guaranteed Maximum Price ("GMP").

The CM role on a typical construction project plays an integral part of the owner's project team and the Agreement reflected this typical relationship stating that the CM would:

> *"work on behalf of the WPCA and in cooperation with the WPCA's representatives and the Engineer as a team in an effort to successfully complete the Project in a timely and efficient manner according to the* **Contract Documents** *and to consult with and advise the WPCA throughout the performance of the Project relative to the services to be performed hereunder."*[1]

The CM Agreement between Gilbane and WPCA also outlined a number of typical CM responsibilities and duties which are common in the industry for such a role. The expected Gilbane role and responsibilities can be generally described as follows:

- Prepare construction cost estimates and schedules and updates of same
- Record and report project progress
- Conduct regular weekly meetings with all relevant parties to discuss project status
- Establish and implement procedures to process Engineer's approvals, where necessary
- Develop bid packages and procure contractors and equipment

---

[1] Page 1,  Agreement between Gilbane and WPCA (GBC_000121)

GILBANE BUILDING COMPANY
REPORT ON CM ROLE AND RESPONSIBILITIES

- Manage contractors and equipment suppliers to conform to plans, specifications and to complete within the required time period
- To manage project records and documentation which may be required by government agencies

Outside of this specific dispute over the Flowserve purchase, I found no evidence or indication that there was any dissatisfaction with Gilbane's performance of its CM role. Accordingly, I have formed the opinion that Gilbane met the reasonably expected Standard of Care when performing the balance of the work for WPCA and will focus the remainder of this report on the specific dispute on the Flowserve pump purchase.

## B. The Bid Process

One of the key project responsibilities of Gilbane, as CM, was to procure contractors, equipment and materials on behalf of WPCA. The Agreement between the parties makes it clear that the contractual terms of the bid documents which Gilbane produced on the project are initially provided by the City of Norwalk.

> "Draft bid documents that include all contractual terms and other requirements governing the hiring of labor and purchasing of materials in connection with the Work that must be included within the Trade Contract will be provided by the City of Norwalk Purchasing Department. The CONSTRUCTION MANAGER is responsible for supplementing the bidding documents and making any and all necessary revisions in order for such documents to be appropriate in form and content for public bidding purposes.[2]

Prior to the formal execution of the CM agreement, on May 18, 2009, Gilbane developed a specific "Project Manual" for the bidding and administration of the Project which was included along with the CDM drawings and specifications that made up the 18 separate "invitation to bid" procurement packages for construction services and equipment supply. The bids were to be submitted for a public bid opening on June 22, 2009. The Project Manual included a separate proposal form for each of the 18 bid packages which are identified in the following table.

---

[2] Page 5 – Paragraph 5,  Agreement between Gilbane and WPCA (GBC_000121)

GILBANE BUILDING COMPANY
REPORT ON CM ROLE AND RESPONSIBILITIES

| Bid Package Number & Name | DAS Prequalification Category |
|---|---|
| 02A – Site Improvements and Utilities | Sitework & Sewer and Water Lines |
| 02B – Excavation & Piles | Sitework |
| 03A – Concrete | Concrete |
| 04A – Masonry | Masonry |
| 05A – Steel & Miscellaneous Metals | Iron: Structural and Miscellaneous |
| 06A – General Trades | General Trades |
| 07A – Roofing | Roofing |
| 08A – Windows and Metal Panels | Doors and Windows |
| 09A – Painting | N/A |
| 11A – Vertical Non-clogging Dry Pit Submersible Pumps and Control System | N/A |
| 11B – Hydraulically Operated Cast Iron Sluice Gates, Aluminum Slide Gates, and Stainless Steel Weir Gates | N/A |
| 11C – Mechanical Bar Screens | N/A |
| 13A – Systems Integration | N/A |
| 15A – Process & Plumbing Systems | Plumbing |
| 15B – Fire Protection | Fire Protection Sprinkler Systems |
| 15C – Mechanical HVAC | HVAC |
| 15D – Pump Valves | N/A |
| 16A – Electrical | Electrical |

The appropriate Contract Documents, in conformance with the Agreement, were included by Gilbane with the Project Manual issued with the 11A bid package that is the subject of this dispute. These documents were:

> (1) *Sample Contract Between Construction Manager and Trade Contractor and*
> (2) *General Conditions for Trade Contractor Agreements dated May 18, 2009.*[3]

It is noted that a Trade Contractor is defined in the Gilbane CM Agreement as follows:

> *"the lowest responsible bidder for a Bid Package that enters a contract with the CONSTRUCTION MANAGER for its work on the Project.*[4]

In my opinion the term "Trade Contractor" typically applies  to construction contractors that work with the various field labor ("trade") specialties, (i.e. electricians, pipe fitters, masons etc.) and would not reasonably be used to refer to material and equipment suppliers for a  project like

---

[3] Section 4 – Examination of Site and Contract Documents, Gilbane Project Manual (GBC_001596)
[4] Page 2 – Definitions, Agreement between Gilbane and WPCA (GBC_000121)

GILBANE BUILDING COMPANY
REPORT ON CM ROLE AND RESPONSIBILITIES

this.   Typically, as was the case in this Project, purchase orders are used to formalize the procurement process.

Insofar as the importance of the bidders addressing the requirements of the Contract Documents the Project manual stated:

> "Bids containing conditions, omissions, alterations, items not called for, or irregularities of any kind, may be rejected for failure to comply with the requirements stated herein."[5]

Concerning the terms and conditions the bid form stated:

> "Execution and offer of this form constitutes the bidder's acceptance of all terms and conditions contained in this form and the project contract documents."[6]

The warranty requirements were stated in various sections within the invitation to bid package, including Section J – Scope of Work – Paragraph 3.0 - Warranty and the warranty clause in the general terms and conditions. Section J – Paragraph 3.0 states:

> "…..Vendor must allow for the warranty date to begin upon substantial completion of the project (on or about October **2011**) and acceptance by the Engineer and Owner……"[7]

The bid package terms and conditions following the proposal form stated the following insofar as the issue of Warranty under Item 6:

> Vendor warrants the materials, services and equipment delivered hereunder (1) to be free from defects in workmanship and materials, (2) to conform to applicable specifications, drawings, samples, or other description given, (3) to be of merchantable quality, and (4) if of Vendor's design, to be free from defects in design.  Vendor agrees to replace or correct promptly without expense to Gilbane Building Company thereof during a period of 12 months after delivery thereof.  In the event of Vendor's failure to correct or replace materials, services and equipment as required herein, Gilbane Building Company may correct or replace such materials, services and equipment and charge Vendor the cost thereof.  No approval by any inspector, agent or Gilbane Building Company employee shall effect the Vendor's obligations under this warranty."[8]

---

[5] Section 7 – Preparation of Bids, Gilbane Project Manual (GBC_001596)
[6] Page 1 – Proposal Form – Bid Package 11A, Gilbane Project Manual (GBC_001596)
[7] Section J – Scope of Work, Paragraph 3.0 – Warranty – Bid Package 11A, Gilbane Project Manual (GBC_001596)
[8] Page 13 – Item 6 – Terms and Conditions – Bid Package 11A, Gilbane Project Manual (GBC_001596)

GILBANE BUILDING COMPANY
REPORT ON CM ROLE AND RESPONSIBILITIES

As reference in development of the bid package Gilbane had WPCA's warranty statement as stated in Volume 2 of its Conformed Technical Specifications which stated the following warranty requirement:

> *"The Contractor shall obtain from the manufacturer its warranty that the equipment shall be fully warranted for a period of 1 year (prorated for 5 years) from the date of Substantial Completion as defined in the General Conditions Division 6, Division 0 and specified in Section 01740, to be free from defects in workmanship, design or material. If the equipment should fail during the warranty period due to a defective (s) shall be replaced in the equipment and the unit(s) restored to service at no expense to the Owner.......... Warranties noted will start on the date of the final acceptance of the units by the Owner"[9]*

This section has common warrantee language that discusses the replacement or repair of a pump. This language often leads to disputes in that the vendor position is that they will repair or replace once it is delivered to its shop at no expense to the owner; while the owner often interprets it as the physical installation work is included as well.  To clarify this common divergence of opinion is why separate and specific "in and out" language is often included in an agreement which is usually negotiated hand in hand with the "limitation of liability" language.  I have never encountered a situation where "no expense to the owner" would include consequential damages such as the loss of opportunity or design failures of the engineer.

My review showed Gilbane adhered to the intent of WPCA's warranty requirements in the bid package and by negotiating a prorated 5 year warranty into the Flowserve purchase order as well as a 5% allowance on the "in and out" costs for removal and reinstallation of defective equipment/parts which was initially resisted by Flowserve.

---

[9] WPCA's Conformed Technical Specifications – Div. 11 – Specification 11312 – Page 8- Sect. 1.10 – Warranty (GBC_001597)

GILBANE BUILDING COMPANY
REPORT ON CM ROLE AND RESPONSIBILITIES

In my opinion, Gilbane conformed to WPCA's commercial expectations in first specifying them and then negotiating the warranty requirements while striking a reasonable balance between the GMP pricing concept and typical warranty risks with a preferred equipment supplier.

The decision on whether or not to reject a bid resided with both Gilbane and WPCA which is confirmed in the manual which states:

> *"The Construction Manager and the City of Norwalk reserve the right to reject any bid if the evidence submitted by, or investigation of, such bidder fails to satisfy the Construction Manager and The City of Norwalk that such bidder is properly qualified to carry out the obligations of the Contract."*[10]

To obtain a reasonable basis for eventual cost certainty Gilbane, as CM, got reliable bids from qualified contractors and suppliers for the bid packages. As part of this effort, in theory it would be expected that Gilbane would try to obtain bids which perfectly met the technical and commercial requirements put forth by the Owner and the Engineer in the bid package.  However, my experience is that, outside of pre-negotiated sole source bids, a perfectly compliant bid is rarely if ever seen in a competitive public tender process because of the different technologies, product features, designs, materials and manufacturing processes employed by different companies making similar but proprietary equipment.  Also, the final installation cost of similar but different equipment could vary significantly due to the orientation of connections, variability in electrical and utility requirements, etc. A well-known example of this difference is in commercial construction in the procurement of elevators for high rise buildings. Conceptually all elevators are similar to a large degree but only the one on which the building design and passenger transportation requirements is based could be truly technically compliant.  Different suppliers also typically have different approaches to managing commercial risk, meaning that negotiations and compromise often may be required to achieve a balance between the cost, schedule and commercial risk objectives of the selling and buying parties. This was evidenced by the terms and conditions offered by G.A. Fleet Associates with the replacement influent pumps

---

[10] Section 9 – Acceptance or Rejection of Bids, Gilbane Project Manual (GBC_001596)

GILBANE BUILDING COMPANY
REPORT ON CM ROLE AND RESPONSIBILITIES

in the approved submittal to WPCA on May 5, 2015[11] which includes similar  terms and conditions on the "in and out charges" to those initially proposed by Flowserve on the original pumps. The consistency of the two positions supports my opinion that this is the typical vendor stance in the industry. In a CM type project any of these proposed compromises are typically shared among the team in a bid review meeting. In fact, the Agreement anticipated that eventual analysis of the accepted bids would be a team effort including the CM, WPCA and Engineer as evidenced in the following requirement for the CM:

> *After receiving and analyzing such bids, the CONSTRUCTION MANAGER shall deliver all of the bids to the WPCA and Engineer. The CONSTRUCTION MANAGER shall then determine, with the reasonable advice of the WPCA and the Engineer, which bids will be accepted for the Project as being the lowest, responsive and responsible bid."[12]*

Although Gilbane, as the CM, acted as the face of the project to the bidders on behalf of WPCA (the Owner), when it was time to award the contracts WPCA was granted final review and approval in the Agreement[13] which was clearly communicated to the bidders in the Project Manual:

> *"After the Construction Manager has received approval from the Owner, the Trade Contractor will be notified that he has been successful."[14]*

This "final say" concept was carried out as a normal practice on the Project as well.  Gilbane sent a letter recommending that the purchase be consummated with Flowserve for Bid Package 11A on or about July 28, 2009[15]. WPCA agreed with the recommendation and formally endorsed placing the order with Flowserve on or about November 30, 2009[16].  Gilbane then issued the Purchase Order to Flowserve on or about December 11, 2009[17].

---

[11] G.A. Fleet Submittal  for Replacement Influent Pumps dated May 5, 2015 (GBC_005634)
[12] Page 5 – Paragraph 5,  Agreement between Gilbane and WPCA (GBC_000121)
[13] Article 5 of the Agreement (GBC_000121)
[14] Section 10 – Form of Contract, Gilbane Project Manual (GBC_001596)
[15] Gilbane Recommendation to Award Letter to WPCA dated July 28, 2009 (REL0000013840)
[16] WPCA Authorization to Gilbane to Award Flowserve Order (REL0000013840)
[17] Gilbane P.O. 59275-000 to Flowserve dated December 11, 2009 (FLOW_020675)

GILBANE BUILDING COMPANY
REPORT ON CM ROLE AND RESPONSIBILITIES

After the initial review of the bids for Package 11A, the Parties apparently settled on Flowserve as the low acceptable bidder as the Flowserve costs and associated clarifications, as stated in its proposal, were used by Gilbane as the estimate basis and the Flowserve exclusions were included in the first Project Control Budget generated[18].

### C.  Project Control Budget

The possible conversion to a GMP that was envisioned in the Agreement can complicate the "team member" relationship described above that is typically associated with the CM role, in that the CM now has a commercial (at risk) motivation to serve as the "team disciplinarian" to ensure the project's GMP expectations are met.

This role is important as purchasing plant and equipment on a project such as the upgrade to the Norwalk WWT, in some respects, is no different than buying new appliances when remodeling one's kitchen.  There is a definitive price/value relationship in both cases.  If someone wants more features on a stove and a long term service contract, one would reasonably expect to pay more than if one bought a floor model off the showroom floor in an "as is" condition with no service contract.  While this example is deliberately extreme, the point being made is in support of the well-known saying that "you get what you pay for" and illustrates the tradeoffs between prices and features.

Because of value/price tradeoffs inherent with a GMP like arrangement, for it to be successful for all parties, it is imperative that there is transparency and a good understanding of what is reflected in the GMP or, in this case, the "Bid Value" in the Project Control Budget. The CM Agreement anticipates this possible issue and devotes a significant amount of contract language to define the "GMP Statement"[19] which, when employed as envisioned in the Agreement, in my opinion, addresses the important need for transparency and understanding between the Parties.

---

[18] Initial Project Control Budget (REL0000007034)
[19]  Section 5 – Agreement – Paragraph E.1 – GMP Statement (GBC_000121)

11

Exhibit 20
Page 12 of 27

GILBANE BUILDING COMPANY
REPORT ON CM ROLE AND RESPONSIBILITIES

1.    GMP Statement

Upon request, the CONSTRUCTION MANAGER will submit a written GMP statement for the WPCA's approval (the "GMP Statement"). The GMP Statement shall include a detailed description stating how the GMP was derived and it shall incorporate the following:

a.    A list of the drawings and specifications, including all addenda thereto and all other data, which was used in preparation of the GMP;

b.    A list of allowances (if any) and a detailed description of each;

c.    A list of the clarifications and assumptions made by the CONSTRUCTION MANAGER in the preparation of the GMP to supplement the information contained in the drawings and specifications;

d.    The GMP Statement shall include a detailed listing of the Project's estimated costs that is organized by trade categories, allowances, contingency, and other items that comprise the GMP; and

e.    The date of Substantial Completion upon which the GMP is based and a schedule of the Construction Documents issuance dates upon which the date of Substantial Completion is based.

The completed GMP Statement and all attachments or other documents incorporated therein shall be incorporated into this Agreement by amendment upon acceptance by the WPCA.

The GMP may be modified to reflect changes in the scope of the Work that the WPCA may approve, pursuant to the terms of Article 9. In the event of any such changes, the WPCA and the CONSTRUCTION MANAGER shall negotiate a fair and reasonable adjustment to the GMP.

From my review of the project documentation and depositions I understand that the term "Project Control Budget" was substituted for "GMP Statement" by the Parties at the early stages of the Project for political and financial reasons. For my further analysis, when addressing the Project Control Budget documents, I consider the intent of the Project Control Budget as being equivalent to the GMP Statement defined in the Agreement.

The documents show that there were continued efforts to refine the Project Control Budget after the initial public bid openings with versions published just after signing the Agreement[20] through to its apparent finalization in late 2009. Judging from its testimony and email communication I believe that the WPCA staff was intimately aware of the Project Control Budget. An example is Mr. Ralph Kolb's response email dated Friday, October 02, 2009 that is contained in Defense

[20] REL0000007034

Exhibit #68 where he answers very specific questions from the state's Mr. Lee Rogers, which demonstrates to me that he had an intimate knowledge of the basis and assumptions associated with that specific estimate. The numbers presented in his response correspond exactly with the "Bid Value" columns on both the "Control Budget Final 10-1-09 Update[21]" and the "Control Budget 11-2-09 Authorized[22]" native files in the discovery documents. There are multiple iterations of this document leading up to these "Final" and "Authorized" versions which demonstrate the likely refinement efforts of the Parties to fine tune the GMP (aka "Bid Value") after the bids were opened in June 2009.

There were at least four different "Bid Values" portrayed in the discovery documents over the refinement period but only fluctuating from a low of $30,726,552 to a high of $30,933,180 before settling on the $30,858,840 apparently prepared for the DEP[23]. The fine tuning represented less than 1% variation in Bid Value indicating to me that the Parties engaged in regular but not radical adjustments and rebalancing to stay within an overall price expectation.

The Bid Value, estimate basis and exclusions associated with the subject of this dispute (Bid Package 11A) were consistent and clear in every version of the Project Control Budget I reviewed. Interestingly I note that both Mr. Ralph Kolb[24] and Ms. Elisabeth Burns[25] deny that there was ever a GMP on this project. While I am sure that the lawyers for both Parties will argue this point, I take a much more pragmatic approach and look at the behaviors of the people and documents used. In this case, the saying that comes to my mind is "if it quacks like a duck". My review of the testimony and documents coupled with my own experience tells me that the Parties managed the project in the spirit of a GMP approach even if they never formalized the concept with an amendment. With this understanding I believe that Gilbane put together a "Bid Value" that met

---

[21] REL0000007200
[22] REL0000010025
[23] REL0000010026
[24] Kolb Deposition Page #321
[25] Burns Deposition Page #257

GILBANE BUILDING COMPANY
REPORT ON CM ROLE AND RESPONSIBILITIES

WPCA's price expectations while maintaining full transparency on the basis of the estimate and exclusions necessary to achieve the price expectations.

Gilbane's development of the GMP statement described above (which again was typically referred to as the "Project Control Budget" during the project) was done in earnest once the bids were opened publically with an initial publication in June 2009[26] until initiating purchasing activities in earnest in December 2009[27].

Conceptually the use of the Project Control Budget, especially in an Excel format at the onset of a the Project, means that the Parties recognized that there would likely be tradeoffs between the eventual final cost ("price") and the features ("values") to achieve price certainty. The multiple versions of this spreadsheet in the discovery documents reflect the fine tuning typically employed when trying to finalize the scope and price. In this situation section (c.) of the GMP statement is especially important since it states that the CM would incorporate into the GMP Statement the following:

> *"A list of the clarifications and assumptions made by the CONSTRUCTION MANAGER in the preparation of the GMP to supplement the information contained in the drawings and specifications."*

After the initial issue of the Project Control Budget in June, 2009 until it was finalized, the Project Control Budget should be considered a "work in progress". A review of the interim versions show that the Parties were working in earnest to finalize the scope, pricing,  clarifications and assumptions that were used in defining the GMP for the Amendment.

It is important to note that at no time during the efforts described above did the clarifications and assumptions concerning the Flowserve scope (i.e. Bid Package 11A) change.  The Project Control Budget consistently included the following clear wording that the basis of the estimate is that it was contingent on WPCA agreement to the Terms and Conditions as submitted by Flowserve.

---

[26] Initial Project Control Budget (REL0000007034)
[27] Delany Deposition  Page 73

14

Exhibit 20
Page 15 of 27

GILBANE BUILDING COMPANY
REPORT ON CM ROLE AND RESPONSIBILITIES

> *"Pumps as supplied by the apparent low bidder (Flowserve) are contingent on Owner agreement to the attached Terms and Conditions as submitted by the vendor. References to "Gilbane Building Company" are understood to be to mean the "Norwalk WPCA". See attachments A, B, and C."* [28]

In the exclusion section of the same document similar clear wording consistently reflects that the labor to remove, ship, and re-install the pump(s) due to a manufacturing defect is excluded in the Bid Value reported[29].  It is inconceivable to me that a competent owner's project team would not be intimately familiar with the project budget on a reimbursable contract (absent the GMP). It is my opinion the evolution of the Project Control Budget documentation demonstrates that WPCA was or should have been fully aware of the pump warranty limitations inherently contained in the Project Control Budget which effectively served as the GMP Statement. Since this was clearly defined in the Agreement, in my opinion, it undermines any WPCA allegations that Gilbane did not perform to the expected CM Standard of Care or did not perform its duties in an appropriate fiduciary manner. For clarity, in a project like this, I consider the CM's primary fiduciary obligation is to protect an owner's best interests while acting within the owner's desired economic objectives. After evaluating the evolution, transparent presentation and management of the Project Control Budget I believe Gilbane fulfilled the expected responsibilities associated with it.

### D.  Bid Package 11A Proposal and Negotiations

During the bidding process three proposals for bid package 11A were received from pump suppliers – Flowserve US Inc., G.A Fleet Associates and KSB, Inc.  Flowserve's proposal stated the following:

> *"This proposal is subject to Flowserve U.S., Inc. attachments A, B, & C enclosed"*[30]

---

[28] REL0000010029
[29] REL0000010029
[30] Flowserve Proposal including Attachments A, B & C (REL0000013870)

GILBANE BUILDING COMPANY
REPORT ON CM ROLE AND RESPONSIBILITIES

The Flowserve attachments referenced were:

Attachment A – Flowserve's Comments to Terms and Conditions

Attachment B – Pump Scope and Technical Comments

Attachment C – VFD Technical Comments

In Attachment A Flowserve qualified its bid statement with an extensive amount of changes to the terms and conditions that were included in the bid package.  In addition to Flowserve's changes and edits to the bid package terms and conditions, Flowserve also inserted a new clause to limit its liability using the following language:

*"Page 14 - Add Item 16 – Limitation of Liability – Add the following paragraph: The remedies set forth herein are exclusive, and the total liability of the Vendor with respect to this Contract, or any breach thereof, whether based on contract, warranty, tort (including negligence), indemnity, strict liability or otherwise, shall not exceed the Contract Price of the specific equipment or service which gives rise to the claim. IN NO EVENT, WHETHER ARISING BEFORE OR AFTER COMPLETION OF ITS OBLIGATIONS UNDER THE CONTRACT, SHALL VENDOR BE LIABLE FOR SPECIAL, CONSEQUENTIAL, INCIDENTAL OR PENAL DAMAGES OF ANY KIND (INCLUDING BUT NOT LIMITED TO LOSS OF USE, REVENUE OR PROFITS, INVENTORY OR USE CHARGES, COST OF CAPITAL, OR CLAIMS OF CUSTOMERS) INCURRED BY GILBANE BUILDING COMPANY OR ANY THIRD PARTY."*

With these changes to the Terms and Conditions as stated in its Attachment A, Flowserve's proposal as submitted did not fully conform to the commercial requirements defined in the bid package. However, it is understood that the CDM design was based on the Flowserve pumps and the project team was very supportive of Flowserve being the successful low bidder as no further modifications would be required to accommodate a different supplier's product in the CDM design[31].  My experience is that, in many cases, changing equipment suppliers from the basis of the plant design which reflects certain dimensions, arrangements and connections can lead to unintended impacts to the civil, structural, piping, electrical and control system designs.  These

---

[31] Delany Deposition Page 34

GILBANE BUILDING COMPANY
REPORT ON CM ROLE AND RESPONSIBILITIES

changes often result in increased installation costs which is considered in equipment procurement decisions, sometimes resulting in decisions to pay a premium over the low bidder to avoid the risks. I certainly appreciate the project team's relief when the bids were open.

On June 23, 2009, shortly following the bid opening, there was a post bid teleconference held between Gilbane, CDM, Aqua Solutions and Flowserve to discuss the Flowserve proposal with action items identified to resolve technical and commercial issues. WPCA had been invited but for some unknown reason did not attend[32]. In this meeting the qualifications represented by Flowserve's Attachments A, B & C were reviewed in detail. The minutes[33] of the meeting noted the following:

> "Flowserve to review the Attachments as discussed at the meeting and revise to meet the parameters as specified in the Bid Documents."

During this meeting the Flowserve representative made it quite clear that there were limits on the liability that his corporation was willing to accept stating:

> "I just wanted to let you know our position up front and, like I said. I mean ... Look at it from our perspective, we cannot let a three billion dollar corporation go under for an $800,000 project."[34]

A position such as this is essentially uniform across responsible equipment suppliers in practically all industries. When viewed from the shareholder's point of view a sale that risks millions of dollars for an $80K profit (assuming a 10% net margin) is not a prudent transaction. Over the course of my career, I have seen some companies that recklessly accepted unlimited risk to gain a unique strategic competitive advantage or out of desperation and I am not aware of any that are still in business. More commonly, suppliers will try to limit liability to a fraction (often 10~20%) of the purchase value, which essentially puts only its profit on that transaction at risk.

---

[32] Delany Depo Page 116
[33] Minutes of Flowserve Proposal Review Meeting held on June 23, 2009 (GBC_000933)
[34] Flowserve Exhibit 27

GILBANE BUILDING COMPANY
REPORT ON CM ROLE AND RESPONSIBILITIES

At this point, my interpretation of events is that the project team was trying to confirm scope issues as well as to negotiate improved terms and conditions with a preferred bidder.  Flowserve was under the impression that the final terms had been negotiated in this meeting[35] and had followed up on June 25, 2009 [36] with a response regarding the June 23rd proposal review meeting.

There appear to have been no further discussions or negotiations on terms and condition between the parties after this exchange in June, 2009.  Shortly thereafter, on July 28th, Gilbane sent a Recommendation to Award letter to WPCA that the order be placed with Flowserve. In November 2009 WPCA countersigned the letter indicating its approval to award the pump order to Flowserve.

Upon receipt of WPCA's written approval Gilbane issued purchase order 59275-000[37] on or about December 15, 2009 to Flowserve for Package 11A for the six (6) submersible pumps and control system. This initial purchase order reflected neither the Flowserve terms on which it based its original June, 2009 proposal nor its revisions sent in response to the bid review meeting.

After receiving the formal purchase order, Flowserve contacted Gilbane on December 20th expressing concern that the terms and conditions that Flowserve believed had been agreed upon in the meeting on June 25th were not included with the purchase order which, in my opinion, serves as Flowserve's notice that they did not accept the order.

Even though the earlier described Flowserve terms were the basis of the Project Control Budget, that served as the de facto GMP, and WPCA had formally approved awarding the order to Flowserve with the terms in effect in November 2009, Gilbane in its March 5, 2010 response to Flowserve's concerns on the terms & conditions effectively reopened the negotiations with Flowserve by indicating that the Owner would not accept any limitations on the original warranty terms presented in the bidding documents. Tipping its hand that there were new

---

[35] FLOW 020685
[36] Plaintiff Exhibit 21
[37] Gilbane P.O. 59275-000 to Flowserve dated December 11, 2009 (FLOW_020675)

GILBANE BUILDING COMPANY
REPORT ON CM ROLE AND RESPONSIBILITIES

negotiations in this same communication, Gilbane did offer some compromises to some of the terms on which Flowserve conditioned its proposal (e.g. payment terms).

On April 6, 2010, Flowserve made some further concessions and sent a revised set of terms and conditions in an apparent effort to resolve the commercial issues. Insofar as the warranty issue Flowserve moved slightly from its earlier position and offered the following warranty language while holding its pricing:

> *"Flowserve agreed to accept costs for removal and installation not to exceed 5% of contract price in our revised Attachment A. As an equipment supplier it is company policy not to pay for these type of costs at all. This [is] a typical requirement of equipment suppliers, and you will find that our competitors publish warranties with similar disclaimers."*

The parties continued with the commercial renegotiations into April 2010, finally agreeing to a revised set of terms and conditions as an amended "Attachment A" to use as the basis of an amended purchase order.

The amended order was issued by Gilbane on June 18, 2010[38]. In the end the "limitation of liability" language in the amended PO accepted by Flowserve was the same exact language used as a condition for its initial bid in June, 2009. While Gilbane was unable to get Flowserve to "bet the company" by yielding to WPCA pipe dream of an unlimited liability Gilbane was successful in getting Flowserve to back-off several key terms and conditions to the benefit of WPCA (e.g. Flowserve accepted "time is of the essence", set-off of monies against disputed claims, and partial in/out costs for equipment repair or replacement)

By the time the amended PO was issued to Flowserve there was likely schedule pressure building on the Project.  The original plan shown in the 11A bid package for the pumps required an April 1, 2011 delivery date. The Flowserve proposal was based on the following required timeframes for manufacturing and delivery of the pumps:

- Submission of detailed shop drawings          56 cal. days

---

[38] Gilbane Purchase Order Amendment 59275-002 dated June 18, 2010 (FLOW_020675)

GILBANE BUILDING COMPANY
REPORT ON CM ROLE AND RESPONSIBILITIES

- Start of fabrication after drawing approval     14 cal. days
- Duration of fabrication     196 cal. days
- Delivery to jobsite (from approval)     203 cal. days

Considering the Flowserve manufacturing schedule, for the Project to realize the April 1, 2011 or earlier delivery, I believe (assuming a typical 14 day approval cycle for the drawings) that Gilbane would have had to award the P.O. no later than 287 days (56 + 14 + 14 + 203) prior to the date the pumps were needed on site which would have been Sept. 26, 2010. While the amended order was placed on June 18, 2010, there was ample but not excessive time available for the pumps to be manufactured and delivered.

I believe that Gilbane, in its role as CM, worked effectively on behalf of the owner, to negotiate further concessions from Flowserve on the terms and conditions on which its bid was originally based while maintaining the bid price. This is an excellent example supporting the GMP approach as the CM held the pricing within the expected cost limits and was able to improve the value to the owner by extracting other valuable commercial concessions.

In retrospect, the delay in resolving the purchase order with Flowserve served to increase the negotiating pressure on Flowserve. This is evidenced in the e-mail communications between the parties which indicate growing concern on the part of Flowserve to resolve the commercial issues and eventually led Flowserve to concede its position on a number of the terms and conditions associated with its initial proposal.

For example, Flowserve initially took the position that it would bear no responsibility for the removal and reinstallation of the pumps in the case of any corrective work. The commercial renegotiations resulted in Flowserve agreeing to the following additional warranty clause:

> *"All removal and reinstallation of the Products (including removal of materials or structures or supply of any equipment, necessary to provide access to the Products) shall be performed by the Seller at its expense except that these costs shall not exceed 5% of the price of the effected Product. Costs exceeding this amount shall be borne by the Buyer."*

20

Exhibit 20
Page 21 of 27

GILBANE BUILDING COMPANY
REPORT ON CM ROLE AND RESPONSIBILITIES

In addition, I determined that Gilbane was also successful in eliminating the term "gross" in defining negligence in the indemnification clause and getting Flowserve to agree not to delete the Set-Off clause.

### E.   Conclusions

In summary, I believe Gilbane's actions as the CM on this Project were consistent with the expectations in the industry where owner representatives act on the client's behalf, to negotiate and secure the most advantageous balance of performance, scope, price and commercial terms with process equipment suppliers and contractors.

I found Flowserve's avoidance of offering unlimited liability in a commercial equipment transaction completely consistent with the typical behavior of other responsible equipment suppliers.  Also, I believe, the WPCA desire to offload typical owner risk in this fashion on the design – bid – build project structure that it orchestrated as being unreasonable and unrealistic.

Ultimately in a GMP type of project there is usually a trade-off for the buyer between the price of the products it is procuring and how much risk can be delegated to the supplier. Often, to realize project budget expectations, the project team (in this case the owner, the CM and the engineer), need to balance risk allocation, cost and schedule to accomplish the project's objectives.  Drawing from my experience I believe that the actions of Gilbane on this project met the industry expectations of a CM firm and Gilbane reasonably fulfilled its duties to the WPCA as outlined in this report.

Exhibit 20
Page 22 of 27

GILBANE BUILDING COMPANY
REPORT ON CM ROLE AND RESPONSIBILITIES

### III. INFORMATION RELIED UPON

The information made available to me for review during the course of my work on this matter was all Bates numbered and consisted of agreements, purchase orders, project execution documents (e.g. emails, minutes of meetings, progress reports, drawings and other such documents), and materials generated during the litigation (e.g. expert reports, depositions, legal filings, etc.)

Exhibit 20
Page 23 of 27

GILBANE BUILDING COMPANY
REPORT ON CM ROLE AND RESPONSIBILITIES

### IV. SIGNATURE

I believe that I have made clear which facts and matters referred to in this Report are within my own knowledge and which are not.  Those which are within my own knowledge I confirm to be true.

The opinions I have expressed represent my true and complete professional opinions on the matters to which they refer.  This report is my own work and the opinions expressed in it are mine.

I reserve the right to supplement this Expert Report should new information become available for my review.

June 26, 2017

_____          _____
Bradley D. Wolf                                                  Date
Berkeley Research Group

Exhibit 20
Page 24 of 27

GILBANE BUILDING COMPANY
REPORT ON CM ROLE AND RESPONSIBILITIES

# APPENDICES

**Appendix A - Curriculum Vitae of Bradley D. Wolf**

**BRADLEY D. WOLF**
BERKELEY RESEARCH GROUP, LLC
Four PPG Place, 4th Floor
Pittsburgh, PA 15222

Direct: (412) 235-4059
bwolf@thinkBRG.com

**EDUCATION**

B.S., Materials Engineering                    Lehigh University, Bethlehem, PA

**PRESENT EMPLOYMENT**

Mr. Wolf is a registered mechanical engineer with nearly 40 years of international project and construction experience as an owner, supplier and EPC contractor in the design, construction and operation of complex infrastructure and industrial facilities. He is familiar with the processes, roles, contract terms, cost systems and typical responsibilities employed in water and wastewater plants and systems.  While at a major international water company he executed water & waste water projects in both the municipal and private sectors. In this role he was responsible for the design, construction and commissioning of several water and waste water collection, distribution and treatment facilities including Groundwater remediation, Public Private Partnership (PPP) and Design/Build/Operate (DBO) Projects. The duties included selecting the process, contracting strategy, and overseeing the design, supply, installation and startup of the projects. He is active in the field having twice served as General Chairman of an International Water Conference and authoring several papers on projects over his career. Mr. Wolf is a licensed professional engineer and has testified both domestically and abroad.

**SELECTED WATER RELATED ENGAGEMENTS**

- Testifying Expert on multiple Drinking Water Plant disputes in CA & WVA, in a PA municipal Waste Water jury trial and in an industrial Waste Water arbitrations in NE & PA.
- Expert services on several Water & Waste Water Treatment equipment disputes in a variety of locals (including MI, NY, CT, TX, WVA and PA) and industries.
- Consulting Expert on performance, operations and design on numerous water treatment plant projects including large municipal sanitary wastewater facilities in Canada and USA.
- Project Neutral retained to analyze assets at a municipal WWT facility and improve plant operations and the financial performance of a Cogeneration/Sludge Drying Facility.
- Arbitrator mutually selected by the Parties for a dispute between the general contractor and the engineer on a PA coal fired power plant groundwater collection WWT project.
- Damages, Process and Design Engineering Standard of Care analysis for a dispute on a corrosion failed Marcellus Shale Gas centralized Frac Water Treatment complex.

GILBANE BUILDING COMPANY
REPORT ON CM ROLE AND RESPONSIBILITIES

- Design evaluation and Engineer Standard of Care analysis on an equipment failure at a municipal waste water treatment plant.
- Testifying Expert on OSHA citations an oil refinery fire water system design and operation.
- Schedule, Damage and Standard of Care for zero liquid discharge WWT at a power plant.

**EPC & STANDARD OF CARE RELATED ENGAGEMENTS**

- Claim & Defect analysis, design standard of care and damage development on multiple mid-stream cryogenic gas storage and processing plants that included deethanizing and fractionating natural gas. (WVA, PA & OH)
- Schedule analyses for a Marcellus Shale mid-stream Owner on a new cryogenic facilities in WVA & PA.
- Design Standard of Care for seller of mid-stream Marcellus Shale Gas storage & processing facility in WVA.
- Project Management Standard of Care & Overrun Analysis of EPCM on a $1B USA metallurgical facility.
- Schedule analysis and support for an international EPC firm on a Nigerian Gas to Liquids plant to support incentive payments.
- Quantum & schedule analysis for South American FBSO EPC $1B+ project with significant deviations from FEED material/complexity.
- Project Oversight and quarterly reporting to the European Board of Directors for a $4 Billion Greenfield industrial project in the USA.
- Defect and PM Standard of Care analysis for Owner on multiple design issues on an EPC beef harvesting and fabrication facility
- Claim analysis, design standard of care and damage development on a mid-stream cryogenic natural gas deethanizing and fractionating processing plant for natural gas in PA.
- Testifying expert in London arbitration on Capital Cost (CAPEX) and Operating Cost (OPEX) for a Nigerian gas storage and processing facility for the separation of Natural Gas Liquids.
- Project organization, contracting and negotiation strategies for a new greenfield and multiple brownfield expansions of Ammonia/Urea production facilities over 3 sites in North America.

**EQUIPMENT & DESIGN RELATED ENGAGEMENTS**

- Claim Standard of Care and Quantum Expert on major equipment package for a large natural gas fired processing plant in international arbitration.
- Damages, Detailed Design evaluation, and Engineer Standard of Care analysis on failed equipment at a solvent-extraction/electrowinning treatment plant.
- Various design & engineering analyses relative to plaintiffs injuries in several cases including hydraulic recycling balers, steel mill rotating equipment, construction winches and furnaces.
- Investigation and failure analysis of a molten glass furnace breakout for a commercial bottler.
- Testifying expert for a construction dispute in a new steel mill melt shop.
- Expert supporting acquiring company over indemnities and warrantees stemming from a design dispute relative to industrial motors used in commercially sized HVAC units.
- Standard of Care analysis on a Procurement Contract concerning the Manufacture and supply of a Vertical Carousel System for the Umbilicals on a subsea oil exploration production unit.

25

Exhibit 20
Page 26 of 27

GILBANE BUILDING COMPANY
REPORT ON CM ROLE AND RESPONSIBILITIES

**TESTIMONY EXPERIENCE**

| | | |
|---|---|---|
| · | Federal Carbide vs. Exeter Construction | US Federal Court |
| · | Calgon Carbon vs. Atlas Construction | Arbitration USA |
| · | Fluor Enterprises vs. TNT Crane & Rigging | Texas District Court |
| · | Process & Industrial Dev. vs. Nigeria | Arbitration London |
| · | Sinopec USA vs. Habaş Sınai | Arbitration Geneva |
| · | ThyssenKrupp CSA vs. MPE | Arbitration Brazil |
| · | British Petroleum vs. OSHA | US Federal Court |
| · | SNC Lavalin vs. ATK | US Federal Court |
| · | Kinder Morgan vs. ARGOS | Texas District Court |
| · | Abengoa Bioenergy vs. Frucon | Arbitration USA |
| · | California Water vs. Bookman | California Superior Court |
| · | Multiplex vs. Boyle & Hildreth | West Virginia Court |
| · | Kranick Enviro vs. HRG Eng. | Pennsylvania Court |
| · | Republic Steel vs. Tesar | Ohio Court |
| · | Veolia Water vs. Consol | Arbitration USA |

**PROFESSIONAL CERTIFICATIONS / AFFILIATIONS**

- Professional Engineer, Pennsylvania
- OSHA Construction Safety & Health
- International Water Conference; General Chairman 2004-2006; Award of Merit 2013; Exec Committee 2002-present
- American Society of Safety Engineers; Professional Member 2016 - present
- Engineer Society of Western PA; Board of Directors 2001-2010
- American Society of Safety Engineers; Professional Member 2016 - present
- Cleveland Engineers Society; Board of Directors/President Elect 1997-2000
- Construction Industry Institute: Board of Advisors; Research Committee 1998-2001
- American Iron and Steel Institute: Capital Effectiveness Committee; Board of Directors; Supplier Committee 1991- present
- Association of Iron and Steel Technology, Foundation Trustee, Life Member 1980-present

**PROFESSIONAL DEVELOPMENT**

- Wharton Executive Development Program, University of Pennsylvania 1994
- Published several papers on projects and technologies in various industries

Exhibit 20
Page 27 of 27