## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| WATER POLLUTION CONTROL | : | |
| AUTHORITY OF THE CITY OF | : | |
| NORWALK, | : | |
|     Plaintiff, | : | |
| | : | |
| v. | : | 3:14-cv-00549 (VLB) |
| | : | |
| FLOWSERVE US INC. | : | March 28, 2018 |
|     Defendant, | : | |
| | : | |
| v. | : | |
| | : | |
| GILBANE BUILDING CO. | : | |
|     Third-Party Defendant | : | |

## MEMORANDUM OF DECISION ON MOTIONS FOR SUMMARY JUDGMENT AND TO EXCLUDE EXPERTS

### I. Introduction

Plaintiff Water Pollution Control Authority of the City of Norwalk ("WPCA") brings claims of products liability, breach of contract, and violation of the Connecticut Unfair Trade Practice Act action against Defendant Flowserve US Inc. ("Flowserve"), and also asserts breach of contract against Third-Party Defendant Gilbane Building Co. ("Gilbane"). Flowserve and Gilbane have both moved for summary judgment against WPCA. [Dkts. 119 (Gilbane MSJ against WPCA); 128 (Flowserve MSJ against WPCA).] In addition, Flowserve brought claims against third-party defendant Gilbane asserting breach of contract and seeking indemnification. [Dkt. 30 (Third-Party Complaint).] Flowserve seeks summary judgment in its favor as to its breach of contract claim, and Gilbane seeks summary judgment as to Flowserve's indemnification claim. [Dkt. 123 (Flowserve MSJ against Gilbane).] Gilbane also asserted counterclaims against

Flowserve seeking contribution and negligence, and Flowserve seeks summary judgment as to both.  [Dkt. 123 (Flowserve MSJ against Gilbane)].  Finally, Flowserve has moved to exclude two of WPCA's experts.  [Dkts. 121 (Motion to Exclude Hodgson); 126 (Motion to Exclude Dickson).]  All motions are opposed.  For the reasons set forth herein, Flowserve's motions to exclude experts Hodgson and Dickson are GRANTED, Flowserve and Gilbane's motions for summary judgment against WPCA are GRANTED, and Flowserve and Gilbane's motions for summary judgment against each other are found as moot.

## II. Factual Background

In 2008, Camp Dresser McKee, Inc. ("CDMS") designed the headworks portion of a wastewater treatment plant upgrade (the "Project") for WPCA.  [Dkt. 130-4 at 14, 251.]  The headworks included machinery to conduct the first stage of wastewater treatment, including "the preliminary treatment, the screening, the pumping, and grit removal."  *Id*. at 13.  When designing the headworks, CDMS began by identifying a pump design which would meet WPCA's operational needs, and then designed the rest of the headworks system upgrade.  *Id*.  The pump design CDMS chose was based on the Flowserve MSX series 3 pumps.  *Id*. at 21.

On June 25, 2009, WPCA engaged Gilbane, a construction management company, to serve as Construction Manager for the Project.  [Dkt. 120-4 (Agreement) at 2.]  Gilbane's contract with WPCA required it to act as WPCA's fiduciary in soliciting bids for subcontractors for the Project.  [Dkt. 146-2 at 2.]

Among other subcontracts, Gilbane solicited bids for vertical non-clog dry pit submersible pumps. [Dkt. 120-6 (Deposition of Patrick Delany) at 36.]

The pumps were required to meet certain specifications set forth by CDMS. [Dkt. 130-4 at 21.] The design specifications were based on the Flowserve MSX series 3 pumps. Id. Among other specifications, the design specifications required that each pump operate at a capacity of 19 million gallons per day and have motors with a maximum 215 horsepower rating. [Dkt. 130-11.] The specifications did not call for venting. Id.

Flowserve, a pump designer, manufacturer, and supplier, submitted the lowest bid. Id. The bid required Flowserve to manufacture the Pumps, but excluded offloading, storage, handling, installation, temporary dunnage, field piping, field wiring, and interfacing with the control system. [Dkt. 130-15 at 8-9.] Flowserve's bid expressly warranted that the Pumps would comply with CDMS's pump specifications, based on the Flowserve MSX series 3 pump, and would be free from defects in workmanship and material. [Dkt. 130-15 at 16.]

Flowserve also provided a six-year, limited, pro-rated warranty covering a pro-rated portion of any repair or replacement covered by the warranty over six years. Id. The warranty excluded coverage if the Pumps were exposed to:

> (1) maintenance, repair, installation, handling, packaging, transportation, storage, operation or use which is improper or otherwise not in compliance with Vendor's instructions; (2) alteration, modification or repair by anyone other than Vendor or those specifically authorized by Vendor, (3) accident, contamination, foreign object damage, abuse, neglect or negligence after shipment to Gilbane Building Company; (4) damage caused by failure of a Vendor supplied Product not under warranty or by any hardware or software not supplied by Vendor; (5) use of counterfeit or replacement parts that are neither manufactured nor approved by

Vendor for use in the Equipment; or (6) Equipment which is normally consumed in operation or which have normal life inherently shorter than the warranty period including, but not limited to, consumables (e.g. gaskets, o -rings, etc.).

Id. Flowserve also provided, in all capital letters, "THESE WARRANTIES ARE EXCLUSIVE AND IN LIEU OF ALL OTHER WARRANTIES, WHETHER WRITTEN, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, INCLUDING BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY, AND FITNESS FOR A PARTICULAR PURPOSE." Id. Flowserve also limited its liability, stating:

Limitation of Liability: The remedies set forth herein are exclusive, and the total liability of the Vendor with respect to this Contract, or any breach thereof, whether based on contract, warranty, tort (including negligence), indemnity, strict liability or otherwise, shall not exceed the Contract Price of the specific equipment or service which gives rise to the claim. IN NO EVENT, WHETHER ARISING BEFORE OR AFTER COMPLETION OF ITS OBLIGATIONS UNDER THE CONTRACT, SHALL VENDOR BE LIABLE FOR SPECIAL, CONSEQUENTIAL, INCIDENTAL OR PENAL DAMAGES OF ANY KIND (INCLUDING BUT NOT LIMITED TO LOSS OF USE, REVENUE OR PROFITS, INVENTORY OR USE CHARGES, COST OF CAPITAL, OR CLAIMS OF CUSTOMERS) INCURRED BY GILBANE BUILDING COMPANY OR ANY THIRD PARTY.

Id.

Flowserve's bid and proposed warranties were discussed at a June 23, 2009 scope review meeting, in which WPCA declined to participate. [Dkt. 130-16 (Scope Review Meeting Minutes).]

WPCA submitted the combined package of all winning bids for Project subcontracts to the Clean Water Fund for approval. [Dkt. 120-38.] In that submittal, Harold Alvord, WPCA's representative, certified that "the information contained above and in any attached statements and materials in support thereof

is true and correct to his/her knowledge." Id. Flowserve's limitation of liability and warranty language was in the Clean Water Fund application. [Dkt. 150 at 6-7.]

The Connecticut Department of Environmental Protection ("DEP") authorized Gilbane to award the subcontract for six vertical dry pit pumps (the "Pumps") to Flowserve on October 9, 2009. [Dkt. 120-3 at 4.] The final purchase order, which was executed on December 2, 2010, included the same warranty and limited liability language which was included in its bid and discussed at the scope review meeting. [Dkt. 120-19 at 1-3; Dkt. 125-10 at 1.]

Flowserve shipped the Pumps to the WPCA plant in August 2011. [Dkt. 130-22 at 190.] Multiple contractors were involved in installing the Pumps, including Electrical Energy Systems (which installed power and control wiring), Ferguson Mechanical (which conducted the pipe to Pump fitting), NIC Systems (which installed supervisory control and data acquisition systems), and Aqua Solutions (which certified that the Pumps were satisfactorily installed and tested). [Dkt. 130-3 at 144-46.] Final start-up and testing of all equipment took place on March 12, March 13, and March 15, 2012. [Dkt. 130-3 at 144-145.] By March 22, 2012, installation and testing of the six Pumps was completed. [Dkt. 120-5 at 154-55.] Nothing out of the ordinary was identified, and the Pumps were commissioned after the March 2012 testing. Id. at 155. Another performance test, on April 18, 2012, revealed that Pump 1 was operating at 50% of expected flow. [Dkt. 130-24.] Pump 1 was disassembled, a large wooden block was found and removed, and Pump 1 was returned to full capacity. Id. On April 30, 2012, CDMS and Gilbane accepted the Pumps and purchase order terms. [Dkt. 130-52.]

On July 15, 2012, the plant experienced a heavy storm and ran all six Pumps simultaneously. [Dkt. 130-9 at 121, 126.] The Project specifications did not state that all six pumps should be able to run at the same time, but rather that the system should be able to handle 95 million gallons of sewage per day, which would require five Pumps to run and allow the sixth to serve as a spare. Id. at 126-27. Nevertheless, for 30 minutes during the storm, the Pumps kept up with the flow. [Dkt. 130-32 at 2.] However, the system "blew wastewater out of the top of the grit tanks which [are] immediately downstream of the Pumps" because grit tanks, which were not manufactured by Flowserve, "couldn't handle the flow" produced by all six Pumps. [Dkt. 130-9 at 126-27; Dkt. 120-19; Dkt. 130-32.] During this event, the variable frequency drives[1] ("VFD") for Pumps 2 and 6 overheated and failed. [Dkt. 120-7 at 123.]

Flow Tech, the subcontractor that supplied the VFDs, investigated the VFD failure. [Dkt. 130-14 at 70.] Flow Tech's investigation revealed that, at WCPA's request, the VFD cooling fans had been modified to operate off of thermostats rather than continuously, and that Pump 6 was set to run at 110%. [Dkt. 130-32.] The VFDs were repaired at no cost to WPCA. [Dkt. 120-7 at 123; Dkt. 120-9 at 123.]

On August 4, 2013, OMI, Inc. ("OMI"), a third-party contracted by WPCA to operate and maintain the facility, bled air from Pump 5. [Dkt. 120-10 at 6.] On August 6, 2013, OMI reported that Pump 5 had no influent flow, and was running

---

[1] Flowserve did not manufacture the VFDs to be used in the system. [Dkt. 130-14 at 70.] Rather, WPCA selected VFDs manufactured by another company, ABB, which were subsequently supplied through Flow Tech. Id.

but not pumping.[2]  [Dkt. 120-10 at 8.]  Shawn Jennings, OMI's maintenance manager, testified that when a pump is pumping but not running, that may indicate that the pump is airbound, and that the air needs to be bled out of the pump.  [Dkt. 130-6 (Deposition of Shawn Jennings) at 118.]  When a pump becomes airbound, the pump seals are not cooled properly and can fail.  [Dkt. 130-3 at 157.]

On August 12, 2013, an OMI pump operator noted that Pump 1 was, in fact, airbound.  Jennings Dep. at 118-19.  On August 13, 2013, Pump 1 reached a high temperature and the primary mechanical seal on Pump 1 failed.  [Dkt. 120-11 at 1; Dkt. 130-38.]   Pump 1 was replaced.  [Dkt. 120-12 (invoice for Pump repair).] Associated Electro Mechanics, Inc. ("AEM"), a Flowserve servicer that inspects and maintains Flowserve equipment, repaired Pump 1 and concluded that the Pump 1 failure occurred due to thermal shock caused by running the pump dry. [Dkt. 120-11 (invoice stating "primary seal failed due to overheated [sic] from running pump dry"); Dkt. 130-8 at 7.]  Inspection revealed wastewater in the coolant system, indicating that four of the six Pumps had experienced a primary mechanical seal failure.  [Dkt. 130-54.]

AEM also evaluated Pump 5 and concluded that the primary mechanical seal in Pump 5 also failed due to thermal shock from running dry.  [Dkt. 120-17 at

---

[2] **WPCA asserts that the OMI daily maintenance reports (Dkt. 120-10) are inadmissible and may not be considered on summary judgment, because they are unauthenticated copies of an unidentified author's daily calendar.  [Dkt. 147 at 5.] Shawn Jennings, OMI's maintenance manager, testified regarding OMI's log books at his deposition (confirming that they were indeed OMI's maintenance log books, but stating he was not personally involved in creating the records), and confirmed that it was reported to him that Pump 1 was run airbound.  Jennings Dep. at 120.**

1.] Pump 5 was repaired on December 30, 2013 and experienced no subsequent catastrophic failures. [Dkt. 120-18 (invoice for Pump repair); Dkt. 120-8 at 44.]

On September 6, 2013, Flowserve denied WPCA's warranty claim for coverage for the seal inspections and repairs of Pumps 1 and 5, explaining that "it is apparent" from AEM's inspection that Pump 1 "ran dry for an extended period which caused the primary mechanical seal to catastrophically fail and allowed the coolant system to be contaminated with sewage." [Dkt. 120-13 (Denial Letter) at 5.] Flowserve further stated that "[b]ased on the information provided on the other pump failures, it is highly likely that the cause is the same for all of the failed units." Id. Flowserve found WPCA's claim not warrantable and declined to cover the charges for the inspection and repair of the Pumps. Id.

Ms. Burns, a Principal Engineer for the City of Norwalk Engineering Division, submitted a sworn affidavit stating she attempted multiple times to contact Flowserve after the denial of the warranty claim, and that Flowserve would not return her calls. [Dkt. 146-2 at 4-5 (stating Ms. Burns sent letters to Flowserve on October 8, 2013 and October 30, 2013).] William Wantz, a Flowserve customer service employee, testified at his deposition that he did not respond Ms. Burns' attempts to contact Flowserve because his manager, Sam Moore, told him to let Flowserve management "handle it." [Dkt. 146-36 at 63.]

On October 31, 2013, Flowserve manager Nicholas Kipe sent a letter to Ms. Burns stating that Flowserve was "working to identify the root cause" of the problems the pumps had experienced in August. [Dkt. 146-2 at 5; Dkt. 146-21.] Mr. Kipe explained that, based on inspection of Pump 1, "the reason for failure is

a catastrophic failure of the lower (primary) mechanical seal," caused by "dramatic temperature swings that typically can only occur when the pump is running dry for a period of time." [Dkt. 146-21.] Mr. Kipe stated if evidence arose during inspection that the failures were due to defects in materials or workmanship, "then Flowserve will of course honor its warranty." Id. Ms. Burns never heard back from Flowserve about its identification of the root cause of the problem. [Dkt. 146-2 at 5.]

In November 2013, Flowserve Senior Electrical Engineer Mohamed Ngayenga conducted a simulation of the Pumps and confirmed that they reacted appropriately when there was low pressure discharge. [Dkt. 146-26 at 103.]

After a February 2014 inspection, Flowserve employee Ryan Malooly stated "the thought was that the seals ran dry to produce this type of failure, but upon examination of the pump station this seems highly unlikely. What else could cause the seals to fail this catastrophically?" [Dkt. 146-23 at 3.] Fellow Flowserve employee Mark Brewster responded that he was "very adamant" that the seals were run dry. Id. at 2. Ms. Burns received a letter from Samuel Moore dated February 14, 2014, which stated that Flowserve believed the pumps had "run dry." [Dkt. 146-2.]

On May 10, 2014, WPCA reported that Pump 1 experienced a "catastrophic failure." [Dkt. 120-14.] However, AEM inspected Pump 1 on May 30, 2014, found no problems, and affirmed that the Pumps' mechanical seals were in good condition. [Dkt. 130-6 at 133.]

On December 1, 2014, WPCA reported that Pump 1 had another failure. [Dkt. 130-6 at 135.] AEM inspected Pump 1, found that the stator was grounded, and replaced it. [Dkt. 130-48.] This repair was covered under Flowserve's pro-rated warranty. [Dkt. 120-15; Dkt. 120-20 at 120.]

At some point in December 2014, Flowserve and AEM inspected the Pumps and discovered that five low discharge sensors,[3] which were set to stop the Pumps after a certain period of low discharge pressure, had been reset. [Dkt. 130-51 at 2; Dkt. 146-3 at 4; Dkt. 146-23 at 3.] The sensors were intended to stop the Pumps after 45 seconds of low discharge pressure, but five of the sensors were not set to stop the Pumps until two minutes of low discharge pressure, and the sensor on Pump 1 was not set to stop that Pump until four minutes of low discharge pressure. Id. at 3. Those settings were high enough that they could have caused catastrophic events such as the prior overheating of Pump 1. Id.

In April 2015, Flowserve Senior Electrical Engineer Mohamed Ngayenga returned to the WPCA facility with AEM employee William Andrejczyk to "set up 6 low discharge pressure switches, verify and validate the proper operation of each pump." [Dkt. 146-27 at 1.] After they completed their work, they reported that they reset the sensors to shut down the Pumps after 45 seconds of low pressure. Id.

There have been no documented catastrophic failures of Pumps 2, 3, 4, or 6. [Dkt. 120-2 at 115-119, 127.]

---

[3] Flowserve contracted to purchase and supply the low discharge sensors, but did not manufacture or install the sensors. [Dkt. 130-55 at 272.] Rather, Ferguson Mechanical was responsible for installing the sensors, and they were purchased from a third-party manufacturer. Id.

WCPA contracted with Arcadis U.S., Inc. to replace the Pumps on January 8, 2015.  [Dkt. 120-34.]  CDMS, the Project designer, conducted a technical evaluation for WCPA and determined it was not necessary to replace the Flowserve Pumps.  [Dkt. 120-2 at 289.]  OMI likewise did not recommend that the Pumps be replaced.  [Dkt. 120-26 at 213.]

### III. Motions to Exclude Experts

WPCA has disclosed two experts for trial: Judith Hodgson, a licensed professional engineer who opines as to whether the Pumps were defectively designed, and Bonneau Dickson, a professional consulting sanitary engineer who opines as to WPCA's damages.  Flowserve has moved to exclude both experts. The Court describes each expert's reports and the motions to exclude them below.

### A. Standard of Review

In order to prevail on a motion for summary judgment, the moving party must present admissible evidence tending there is no genuine issue as to material fact and that it instilled to judgment as a matter of law. ." Fed. . Civ. P. 56(c)("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. . Civ. P. 56(c)(4).  "Because the purpose of summary judgment is to weed out cases in which 'there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law,' it is appropriate for district courts to decide questions regarding the admissibility of evidence on summary judgment." *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) (quoting Fed. R. Civ. P. 56(c)).

An expert report is not a "talisman against summary judgment." *Id.* If the expert testimony is excluded as inadmissible, the court must make the summary judgment determination without that evidence. *Id.* at 66-67. Accordingly, the Court must examine the admissibility of WPCA's experts' testimony before ruling on the motions for summary judgment. *See, e.g., Rexall Sundown, Inc. v. Perrigo Co.*, 651 F. Supp. 2d 9, 25 (E.D.N.Y. 2009) (discussing the summary judgment standard and noting that the court must examine the admissibility of plaintiff's expert testimony in ruling on defendant's motion for summary judgment).

A motion to exclude evidence "calls on the Court to make a preliminary determination on the admissibility of the evidence under Rule 104 of the Federal Rules of Evidence." *Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 470 (S.D.N.Y. 2005). Evidence should be excluded if it is inadmissible. *Id.* "Under Rules 701 and 702, opinions must be helpful to the trier of fact," in order to be admissible. Hygh v. Jacobs, 961 F.2d 359, 363-64 (2d Cir. 1992). In addition, "Rule 403 provides for exclusion of evidence which wastes time." *Id.* "These provisions afford ample assurances against the admission of opinions which would merely tell the jury what results to reach." *Id.*

Rule 702 requires a valid scientific connection to the inquiry as a prerequisite to admission. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 591 (1993). Expert witness testimony is admissible only if: (1) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;" (2) "the testimony is based upon sufficient facts or data;" (3) "the testimony is the product of reliable

principles and methods;" and (4) "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702; *Amorgianos v. Nat'l R. R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002). Although Rule 702 embodies a "liberal standard of admissibility for expert opinions," Nimely v. City of N.Y., 414 F.3d 381, 395 (2d Cir. 2005), it also "establishes a standard of evidentiary reliability" for "all scientific, technical, or other specialized matters within its scope." Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 148 (1999). What constitutes a "reasonable measure[] of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Id*. at 153.

"Although Rule 702 sets forth specific criteria for the district court's consideration, the *Daubert* inquiry is fluid and will necessarily vary from case to case." *Amorgianos*, 303 F.3d at 266. District courts may consider a number of factors when assessing an expert's reliability, such as (1) whether a theory or technique "can be (and has been) tested," (2) "whether the theory or technique has been subjected to peer review and publication," (3) a technique's "known or potential rate of error," and "the existence and maintenance of standards controlling the technique's operation," and (4) whether a particular technique or theory has gained "general acceptance" in the relevant scientific community*. Daubert,* 509 U.S. at 593-94; *see also Amorgianos*, 303 F.3d at 266; *Fed. Deposit Ins. Corp. v. Suna Assocs., Inc.,* 80 F.3d 681, 687 (2d Cir.1996).

The *Daubert* analysis is flexible and dependent on the facts of the particular case; the above factors "do not constitute a definitive checklist or test." *Daubert,* 509 U.S. at 593; *Kumho Tire,* 526 U.S. at 150 ("the gatekeeping

inquiry must be tied to the facts of a particular case"); *Amorgianos*, 303 F.3d at 266. "In undertaking this flexible inquiry, the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Amorgianos*, 303 F.3d at 266 (citing *Daubert,* 509 U.S. at 595). An expert's opinion is not admissible unless a "rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand" reveals that the opinion is "reliable at every step." *Amorgianos*, 303 F.3d at 266.

An expert's opinion is not reliable if it "simply rehash[es] otherwise admissible evidence about which he has no personal knowledge." Schneider, 379 F. Supp. 2d at 468-69 (citing Fed. R. Evid. 703). "While an expert must of course rely on facts or data in formulating an expert opinion, an expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence." *Id.* Such an opinion would lack the "level of intellectual rigor [which] would be expected in the scientific community," and which is required in the courtroom. *Amorgianos*, 303 F.3d at 296.

In addition to the standard for admission of expert testimony set forth in Rules 702 and 703, the court may also "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. "These

circumstances entail risks which range all the way from inducing decision on a purely emotional basis, at one extreme, to nothing more harmful than merely wasting time, at the other extreme. Situations in this area call for balancing the probative value of and need for the evidence against the harm likely to result from its admission."  Notes of Advisory Committee on Proposed Rules.  Accordingly, under Rule 403, an expert's opinion may be excluded if it risks "an undue tendency to suggest decision on an improper basis," in addition to the bases for exclusion under Rules 702 and 703.  Id.

B. Summary of Judith Hodgson's Report

Ms. Hodgson, a licensed professional engineer, has a bachelor's degree in mechanical engineering from Penn State.  [Dkt. 122-2 at 7.]  She served as an engineer at DuPont for ten years; while there she served as a maintenance and reliability engineer, as well as a project engineer specifying and sizing equipment for a $90 million chemical plant.  Id.  She also spent ten years as a corporate pump consultant, trouble-shooting pumps and seals within DuPont, including at several wastewater facilities.  Id.  She also worked in the Reactor Coolant Pump (RCP) Services group at Westinghouse for six years, where she focused on the three-stage seal for RCP vertical pumps.  Id.

Hodgson concluded that the Pumps had eight design defects which "were the cause of the pump failures and operational problems that plagued WPCA's operation of its treatment plant since at least August 2013."  Id. at 13.  In light of those defects, Hodgson concludes that it was "in WPCA's best interest" to replace the Pumps.  Id.  The defects Hodgson identifies include the following.

First, Hodgson found that the 200 horsepower Pump motors were undersized, and provided only 1% above what was calculated to be required, whereas the "rule-of-thumb margin is at least 10 to 15% to allow for unknowns and/or unaccounted-for differences." Id. at 13. Hodgson explained that smaller motors run hotter than larger motors, which raised the temperature of the coolant, which caused the lower seal to leak. Id. Once coolant leaked out of the lower seal, the remaining coolant and motor became hotter, and caused an explosion when the liquid ultimately vaporized. Id. Hodgson asserts this explosion caused both seals to fail. Id.

Second, Hodgson found the Pumps defective because they did not include vents, and also asserted Flowserve should have alerted WPCA that it would need to add vents to the Pumps. Id. Hodgson explained that the Pumps are prone to filling with gas while off, and once a pump is full of gas, when it is turned on, the sewage will churn but will not flow. Id.

Third, Hodgson found the Pump shafts not strong enough to render the seals and bearings reliable. Id. at 14. Hodgson opined that the Pumps lacked necessary stiffness, and that stiffness prevented the lower mechanical seals from sealing properly. Id. In addition, Hodgson asserts the Pumps were less bend-resistant than other pump manufacturers' shafts, and that they were inadequate for the exceptional demands of the WPCA system. Id.

Fourth, Hodgson found that the lip seal for the lower bearings was defective, and had a useful life of only about three months, after which it provided no protection against contaminants entering the bearing or grease exiting the

bearing.  Id.  At that point, fluid leaking from the pump seals could have reached the motor and caused a short circuit.  Id.

Fifth, Hodgson found Flowserve's suction elbow design defective because it caused gas bubbles to form, which blocked the flow of wastewater into the impeller and made the wastewater flow erratically.  Id.  This erratic flow increased the force exerted on the impeller and threatened to cause a "pump trip."  Id.

Sixth, Hodgson found the Pump design's lack of indicators to monitor the coolant was a defect.  Id. at 15.  If the Pumps had included coolant monitors, Hodgson reasoned it would have been easier to address issues like a low coolant level or contaminated coolant.  Id.  Without monitors, Hodgson asserted the "only indication WPCA received" when coolant overheated and became contaminated for these problems "was that the motor automatically shut off due to high temperature."  Id.

Seventh, Hodgson found that the Pump design lacked the ability to provide proper warning about a leaking seal.  Id.  The Pumps were designed to alert the pump operator to a seal problem if the upper seal leaked.  Id.  The Pumps did not include an alert when the lower seals leaked, and the only indication WPCA received of the lower seal leaks was that the motor automatically shut off due to high temperature.  Id.  In addition, Hodgson explained that the upper seals failed catastrophically, but grease from the thrust bearings stopped the resultant leakage from entering the barrier chamber where the moisture meter is located. Id.  As a result, no alarm was triggered and WPCA was not alerted that their seals had failed.  Id.

Eighth, Hodgson found the design of the sensors for the low pressure monitors defective.  Id.  While Flowserve did not manufacture or design the monitors, Hodgson included them in her analysis because Flowserve supplied them.  Id.  Hodgson asserted the low pressure discharge sensors were supposed to automatically stop the pump when the pump could not generate enough pressure.  Id.  Hodgson opined that the pressure sensors failed to provide that protection, and in fact "did not provide any protection for the first 3 years that [the Pumps] were in operation."  Id.

In addition to asserted defects, Hodgson opined that the Pumps failed to meet three Project specifications.  First, the specifications required the Pumps to include a suction elbow that provided equal flow distribution to the impeller; Hodgson asserted the provided elbows allowed erratic flow.  Id. at 16.  Second, the specifications required the Pumps' upper seals to be in an oil-filled chamber; Hodgson asserts the upper seals provided were in an air-filled chamber.  Id. Third, the specifications required the bearings to be permanently lubricated; Hodgson asserts the supplied bearings eventually lost their lubrication.  Id.

Lastly, Hodgson opined that Flowserve delivered equipment that did not match the description in its purchase order submittal.  Id. at 16.  Specifically, Flowserve represented that it would provide common cartridge seals to be used as lower seals, but in actuality they provided component seals.  Id.  Hodgson explained that cartridge seals are pre-set and pre-tested, whereas component seals are not pre-tested and require adjustments upon installation.  Id.

Hodgson advised that the cost of replacing the Pumps' motors with larger Flowserve motors would be too expensive, and would also be ineffective because the Pumps would still be "too sensitive" after the motor replacement. *Id.* at 17. For these reasons, she recommended replacing the Pumps with pumps from another manufacturer. *Id.*

Hodgson also concluded that Flowserve should not have denied WPCA's warranty claim, because the Pumps' failure was due to a design defect rather than improper operation. Id. Hodgson concluded the Pumps' inability to run dry without failing was due to the aforementioned design defects, including inadequately lubricated seals, a lack of vents, an improperly sized motor, poorly designed elbows, and inadequate sensors. Id. Hodgson asserts the Pumps failed because of those design defects, rather than an operational issue. Id.

C. <u>Analysis: Motion to Exclude Hodgson</u>

Defendant moves to exclude Hodgson's testimony because Hodgson lacks the qualifications required to testify and because Hodgson's conclusions are not supported by acceptable methodology. [Dkt. 66.] The Court addresses each challenge to Hodgson's report below.

i. <u>Hodgson's Credentials</u>

Flowserve asserts Hodgson is unqualified to opine on whether the Pumps were defective because she does not have the requisite experience with the type of pump at issue in this case. [Dkt. 122.]

"District courts are accorded considerable discretion to determine an expert's qualifications." United States v. Diallo, 40 F.3d 32, 34 (2d Cir. 1994). A

witness is qualified where he or she has "superior knowledge, education, experience, or skill with the subject matter of the proffered testimony."  Vale v. U.S., No. 15-3265, 2016 WL 7435909, at *1 (2d Cir. Dec. 21, 2016) (summary order) (finding an expert unqualified to testify as to plaintiff's medical diagnosis where expert was trained in a different medical discipline, had no a valid license to practice medicine, and had not practiced medicine in 16 years).

"The expert's qualifications . . . must be relevant to the opinions she offers. Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony."  Diallo, 40 F.3d at 34 (finding expert qualified who had never been to Benin but had advised neighboring African countries about their gold export policies relying on their gold export regulations, reasoning that experience meant the expert was able to evaluate the effect Benin's regulations had on exporting gold from Benin); see also Duchimaza v. U.S., 2016 WL 5799295, *5 (D. Conn. Sept. 30, 2016) (finding expert's 22 years of experience in retailer compliance before the EBT program was implemented insufficient to qualify him as an expert in identifying EBT fraud).

Flowserve asserts Hodgson is unqualified to opine on whether the Pumps were defective because she based many of her opinions on her experience with nuclear pumps, rather than wastewater pumps.  [Dkt. 122.]  To further support its position that Hodgson does not have the requisite knowledge for this case,

Flowserve cites Hodgson's admission that she consulted with fellow engineers before rendering her opinion.  Id.

WPCA responds that Hodgson is qualified to testify in this case because she has worked as an engineer in pump design or inspection for twenty years. WPCA states the argument that Hodgson is not qualified to testify about problems with mechanical seals and pumps at the WPCA facility because she worked on mechanical seals and pumps at nuclear power plants is "akin to suggesting that an engineer who gained her knowledge working for Chevrolet could not testify about combustion engines, or a particular engine at issue, in a vehicle manufactured by Ford."  [Dkt. 141 at 2-3.]

Hodgson was responsible for inspecting and troubleshooting problems with pumps for DuPont's pump division for over 15 years.  Hodgson Report at 1. Hodgson also worked for Westinghouse as a lead development and design engineer for seals of reactor cooler pumps.  Hodgson Dep. at 24.  Hodgson described her experience with wastewater facilities in her deposition:

> We were on the same floor as the civil engineers [at DuPont], the pump consultants, and when they came asking us about, you know, the pump, I had just been trained on the Hydraulic Institute standard on how to design a pump, designing the pumping system for wastewater.  And they, they weren't aware of that standard, so I helped with -- with that by following the HI standard and setting up a spreadsheet for them.  But I didn't have to go out and then do anything more than 'here are the equations, here are the drawings, here's the spreadsheet.'

Id. at 37.

Flowserve has failed to explain why Hodgson's experience designing and troubleshooting pumps is not applicable to this case.  For example, the Court

notes that Hodgson has never worked with wastewater pumps in the context of a municipal wastewater treatment facility, and has never worked with dry pit submersible pumps. [Dkt. 122-3 (Hodgson Dep.) at 31-37.] However, she has designed a seal to prevent a leak from reaching a nuclear reactor and causing the nuclear reactor to melt down. Id. at 32-34. While Flowserve posits that the radioactivity of a nuclear reactor would impact the type of seal required to prevent a leak, Flowserve offers no evidence supporting its conclusion that Hodgson's experience with nuclear reactor pumps has not equipped her with relevant skills and expertise. Nor has Flowserve explained why Hodgson's experience in DuPont's pump division is inapplicable.

Likewise, while Hodgson has never worked for a pump manufacturer and has never performed hands-on maintenance on a pump, her training at DuPont required her to install mechanical seals on pumps. Id. at 32, 35-36. Flowserve again fails to establish why Hodgson's experience is inadequate. While an expert witness's qualifications must be within the subject matter of the witness's testimony, the expert's experience need not be identical to the case at hand. See Diallo, 40 F.3d at 34.

In addition, Flowserve's assertion that Hodgson's consultation with fellow engineers renders her unqualified is unavailing. Hodgson explained at her deposition that she spoke with a retired pump consultant, Robert Hart, who "told [her] how pumps are designed," and opined that the Flowserve pump design "looks like they were picking existing parts so, you know, not -- it is not their own motor, that sort of thing. They didn't design the motor." Hodgson Dep. at 127.

She also testified she spoke with William Livoti, a motor and drive expert, who is her "go-to person . . . when it comes to motors."  Id. at 141.  Hodgson explained that while:

> I know about motors and motors that drive pumps and so forth, I didn't want to make any conclusions based on just my knowledge.  I wanted to make sure that I wasn't overlooking something or misunderstanding something.  So he as an expert looked at it after I had looked at it and tried to understand it.  And then I would explain to him what I saw and what I understood, and then he would tell me what he saw and what he understood and what I should further dig into.

Id. at 142.

Unlike Dickson, discussed below, Hodgson did not adopt the opinions of other experts.  She consulted fellow engineers to assure the validity of her analysis and conclusion.  Peer consultation and review is a customary and appropriate means of conducting and validating the delicacy of scientific research.  Rules 702 and 703 do not prohibit experts from consulting with other experts in their field.  *See* Fed. R. Evid. 703 (allowing experts to rely on any facts or data upon which other experts in that field would reasonably rely).  Flowserve's argument that Hodgson is unqualified on this basis is unavailing.  The Court finds Hodgson qualified to render an expert opinion in this case.

ii.Hodgson's Analysis

Flowserve also challenges Hodgson's analysis.  Under Daubert, courts determine the reliability of an expert's analysis by considering "the theory's testability, the extent to which it 'has been subjected to peer review and publication,' the extent to which a technique is subject to 'standards controlling the technique's operation,' the 'known or potential rate of error,' and the 'degree

of acceptance' within the 'relevant scientific community.'" Restivo v. Hessemann, 846 F.3d 547, 575–76 (2d Cir. 2017) (citing U.S. v. Romano, 794 F.3d 317, 330 (2d Cir. 2015); Daubert, 509 U.S. at 593–94.

If an expert "wants to testify to an opinion or conclusion that has not been established to a degree of scientific certainty . . . the court must still assess whether the expert employs "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field," and may consider the Daubert factors in making this determination or other relevant factors. Kumho Tire Co., 526 U.S. at 152. Whether expert analysis is based on experience or training as opposed to a methodology or technique, the "trial judge should exclude expert testimony if it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison." Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC, 571 F.3d 206, 214 (2d Cir. 2009); Duchimaza v. United States, No. 3:14-CV-00887, 2016 WL 5799295, at *5 (D. Conn. Sept. 30, 2016). Expert opinions must likewise be excluded where the court "conclude[s] that there is simply too great an analytical gap between the data and the opinion proffered." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997); see also Restivo, 846 F.3d at 546.

Flowserve asserts Hodgson's opinion is unreliable for three reasons: (i) she relied on inadequate surveys; (ii) she failed to consider all relevant evidence; and (iii) she relied on undisclosed materials. The Court addresses each argument below.

1.    **Reliance on Inadequate Surveys**

First, Flowserve asserts Hodgson unilaterally conducted user and
manufacturer surveys that should be excluded as methodologically flawed.
Hodgson's report indicates that she relied on the results of these surveys to
conclude that (1) the Pumps' suction pipe had more volume per length than other
pipes, which caused WPCA more problems than is typical; (2) the Pumps were
defectively designed because they lacked vents, based on the fact that
competitors in the market believe venting is necessary; and (3) Flowserve pumps
are unreliable as compared to Flygt, a competitor.  Id. at 9 (citing Hodgson Report
at 14, 38, 40, 89).

In Schering Corp. v. Pfizer, 189 F.3d 218 (2d Cir. 1999), the Second Circuit
clarified the standards governing the admissibility of survey evidence.  As the
Second Circuit explained, the "great majority of surveys admitted in this Circuit"
fall into the Federal Rule of Evidence 803(3) hearsay exception because "they poll
individuals about their presently-existing states of mind to establish facts about
the group's mental impressions."  Id. at 227-28; Drs. Assocs., Inc. v. QIP Holder
LLC, 3:06-cv-1710, 2010 WL 669870, at *9 (D. Conn. Feb. 19, 2010) (VLB).   Surveys
of this type qualify "for a traditional hearsay exception," which "obviates the
need to examine methodology before overruling a hearsay objection."  Schering,
189 F.3d at 227-28.  In cases where the survey evidence meets the hearsay
exception for presently-existing states of mind, "errors in methodology thus
properly go only to the weight of the evidence—subject, of course, to Rule 403's

more general prohibition against evidence that is less probative than prejudicial or confusing." Id.

In so holding, the Second Circuit expressed its agreement with the "modern view" that such surveys should be admitted as a general rule, and their weight should be determined by whether they employed proper methodology, which is characterized as follows:

> (1) the universe was properly defined, (2) a representative sample of that universe was selected, (3) the questions to be asked of interviewees were framed in a clear, precise, and non-leading manner, (4) sound interview procedures were followed by the competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted, (5) the data gathered was accurately reported, (6) the data was analyzed in accordance with accepted statistical principles, and (7) the objectivity of the entire process was ensured.

Schering Corp., 189 F.3d at 225. "These factors derive from accepted principles of survey methodology and help define when a survey has been properly conducted." Id. While surveys are most often admitted in trademark and false advertising cases, they are not limited to that purpose, and have been used in other contexts. Id. (citing Keith v. Volpe, 858 F.2d 467, 479–81 (9th Cir. 1988) (admitting survey to show statistics concerning respondents' race, income and housing preferences); Debra P. v. Turlington, 730 F.2d 1405, 1408, 1412–14 (11th Cir. 1984) (admitting survey to show "whether the teacher[s] [surveyed] had provided instruction during 1981–82 relating to the skills tested on the SSAT–II and if so, whether that instruction had been sufficient for a student to master the skills").

Where a survey does not fit within the Rule 803(3) hearsay exception, it may still be admissible under Federal Rule of Evidence 807's residual hearsay rule. Schering, 189 F.3d at 231. Rule 807 allows admission of a statement which has "circumstantial guarantees of trustworthiness" which are "equivalent" to the trustworthiness of statements falling within the hearsay exceptions in Rules 803 and 804. Id. A statement is admissible under Rule 807 if:

> (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

Id. "To be admissible under this exception, the evidence must, in other words, fulfill five requirements: trustworthiness, materiality, probative importance, the interests of justice and notice." Id. (quoting United States v. Harwood, 998 F.2d 91, 98 (2d Cir.1993)).

Proper methodology, as described above, can ensure the trustworthiness of a survey. Id. at 233. A survey is admissible under the residual exception of Rule 807 if it employed proper methodology and does not otherwise lack circumstantial guarantees of trustworthiness. Id. at 233-34.

Flowserve asserts Hodgson's survey of other Flowserve customers and her review of user manuals for competitors' pumps did not use proper methodology and are accordingly inadmissible. WPCA does not dispute that

Hodgson's conversations with customers and review of user manuals do not abide by the Schering standard. [Dkt. 141 at 8-9.] Rather, WPCA responds that Hodgson did not conduct scientific "surveys" subject to the Schering standard, but merely sought to "properly and fully investigate the nature of the product at issue." [Dkt. 141 at 8-9.]

Although WPCA concedes the point, the Court notes that Hodgson's "surveys" of Flowserve customers and competitor user manuals do not abide by the Schering standard. Here, Hodgson's survey did not "poll individuals about their presently-existing states of mind," but rather purported to collect data about the performance of Flowserve pumps based on the truth of the matter asserted in survey respondents' answers. Hodgson's survey does not meet the Fed. R. Evid. 803(e) hearsay exception, and accordingly errors in methodology would render the survey inadmissible. Schering, 189 F.3d at 230.

First, Hodgson did not properly define the universe for the survey and did not conduct her survey on a representative sample of any such universe. Rather, Hodgson testified that she determined which Flowserve customers to contact by starting with Flowserve's list of references provided to WPCA. Hodgson Dep. at 73-74. In addition to those customers, Hodgson asked "contacts in engineering firms that do sewage plants" whether they had additional contacts, and "that led to other people that led to other people." Id. at 77. Hodgson does not know the exact number of Flowserve pump users surveyed, and does not assert that all customers surveyed use the same Flowserve pumps under substantially the same conditions as the WPCA facility. Id. Hodgson's universe is not sufficiently

defined, and her survey respondents are not sufficiently representative to be methodologically sound.  See, e.g., CSL Silicones, Inc. v. Midsun Grp., Inc., 3:14-cv-1897, 2017 WL 6055380, at *7 (D. Conn. Dec. 7, 2017) (finding a survey lacked an adequate universe and representative sample, where the "universe for the subject survey was culled from a list of individuals identified as potentially responsible for using, purchasing, specifying, or recommending" the product at issue, but not exclusively that product).

Next, Hodgson's survey questions were not clear or precise, as required under the Schering standard.  Rather, while the interviewer began by asking the same questions of each survey participant, she eventually altered the survey questions based on the information she had already gained.  Id. at 71, 84 ("[B]ecause she was learning as she went, other questions were added.").  The failure to ask survey questions "in identical fashion" constitutes flawed methodology.  See, e.g., Lion Oil Trading & Transp., Inc. v. Statoil Marketing & Trading, 08-cv-11315, 2011 WL 855878, at *3 (S.D.N.Y. Feb. 28, 2011) (noting failure to ask identical questions of each survey respondent was flawed, but finding that flaw went to weight rather than admissibility because the survey, unlike the survey in this case, fit within Federal Rule of Evidence 803(3)'s hearsay exception).

In addition, the survey did not abide by sound interview procedures.  Rather, when the interviewer conducted surveys, she "posed as a person . . . considering buying [Flowserve] pumps," and asked if the person contacted recommended Flowserve pumps.  Id. at 85.  Although Hodgson noted that writing

down the introduction to ensure consistency in each call would be the "best practice," Hodgson and her interviewer did not write down the introduction used here.  Id. at 86.  See, e.g., Lion Oil Trading & Transp., 2011 WL 855876 at *3.

Finally, Hodgson did not conduct a meaningful scientific analysis of her survey results, but rather reiterated answers from various interviews in her report without analysis.  [Dkt. 122-4 (handwritten notes).]  Hodgson's survey of Flowserve customers did not abide by proper methodology and lacks indicia of trustworthiness sufficient for admission under Federal Rule of Evidence 807 and Schering.

Even if the customer and user manual "surveys" were not analyzed under Schering, as WPCA asserts they should not be, they would be inadmissible. While an expert may rely on inadmissible hearsay in forming opinions, the expert may not simply repeat information she read or heard without analysis.  United States v. Mejia, 545 F.3d 179, 197 (2d Cir. 2008) (finding expert testimony improper where it merely transmitted the contents of interviews to the jury without analysis).  Rather, an expert must form her own opinions by "applying [her] extensive experience and a reliable methodology" to the inadmissible materials.  Id.  Without an analysis, the "expert is simply repeating hearsay evidence without applying any expertise whatsoever."  Id; Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 267 (2d Cir. 2002) ("[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the

expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

Hodgson's survey of pump manufacturers is similarly flawed.  Id.  Hodgson reviewed pump manuals from "four or five" companies to "see what they said about venting" because "everybody seemed to have had vents on [their pumps]."  Hodgson Dep. at 171-72.  Hodgson found that "they all said if it is a dry well you need to vent."  Id. at 172.  However, WPCA has offered no evidence that the competitor user manuals were a representative sample of an appropriately defined universe; the Court finds they were not.  See Vista Food Exchange, Inc. v. Vistar Corp., 2005 WL 2371958, at *7 (E.D.N.Y. Sept. 27, 2005) (finding universe of 75 respondents too small and insufficiently defined to provide reliable survey results).  In addition, Hogdson has offered no qualitative analysis she used to determine the similarities or differences between the Flowserve Pumps and other pumps whose manuals she reviewed.  Rather, it appears Hodgson reviewed competitor pump manuals, identified differences between the pumps, and concluded that the Flowserve Pumps should have been more similar to competitor pumps.  Hodgson's discussion of competitor user manuals lacks analysis and is insufficiently scientific to be admissible as an expert opinion.  Mejia, 545 F.3d at 197.

Accordingly, to the extent Hodgson's report is based on inadmissible surveys, or simply "transmit[s] . . . hearsay to the jury," Hodgson's report must be excluded.  Mejia, 545 F.3d at 197.  Hodgson's report indicates that she relied on the results of these surveys to reach three conclusions.  Because the surveys

were not scientifically sound, the Court rejects her conclusions that (1) the Pumps' suction pipe had more volume per length than other pipes, which caused WPCA more problems than is typical; (2) the Pumps were defectively designed because they lacked vents, based on the fact that competitors in the market believe venting is necessary; and (3) Flowserve pumps are unreliable as compared to Flygt, a competitor.

2.      **Failure to Consider All Relevant Facts**

Flowserve next asserts Hodgson did not base her opinions on sufficient data and facts.  An expert opinion must be based on "sufficient facts and data" in order to be admissible.  Fed. R. Evid. 702; see also Wills v. Amerada Hess Corp., 379 F.3d 32, 48 (2d Cir. 2004); see also Amorgianos, 303 F.3d at 265-66 (requiring a "sufficiently reliable foundation" to admit an expert opinion).  The emphasis on sufficient facts and data is not intended to allow exclusion of an expert on the basis that a court believes one version of the facts rather than another.  Fed. R. Evid. 702, Notes of Advisory Committee on 2000 amendments.  Indeed, an expert may employ her expertise to draw conclusions in the face of conflicting evidence.  Cellular Phone Taskforce v. F.C.C., 205 F.3d 82, 90 (2d Cir. 2000).  However, an expert may not disregard relevant information in conducting her analysis.  Amorgianos, 303 F.3d at 268; Faulkner, 46 F. Supp. 3d 365, 383 (S.D.N.Y. 2014) ("To ignore contradictory testimony in order to arrive at a desired conclusion highlights the unreliability of [an expert's] methodology.").

Here, Flowserve asserts Hodgson disregarded two categories of evidence: evidence that the Flowserve Pumps were not based on an old Worthington pump

design, and evidence of how the Flowserve Pumps were maintained and operated.  WPCA disputes both arguments.

First, the Court considers Hodgson's determination that the Flowserve Pumps were based on an old design.  Hodgson testified at her deposition that she based that conclusion on multiple factors.  First, Hodgson reviewed "cross-sectional drawings of the two" pumps, as well as "brochures that were showing all the submersible pumps."  Hodgson Dep. at 124, 129-30.  Hodgson noted that "the [Flowserve Pump] has a, what I consider a unique looking impeller which makes me go, I wonder why, and I looked to the right and there was one just like it [on the Worthington pump] and the other ones on that brochure did not have a similar look to them."  Hodgson Dep. at 129-30.

In addition, Hodgson testified Robert Hart, whom she consulted about pump design, noted that the Flowserve Pump design did not look like all of the components were designed to work together, but rather that the design used "existing parts."  Hodgson Dep. at 127.  Hodgson stated that information bolstered her "suspicion" that the Pumps were based on an old design.  Id. at 127.

Hodgson also stated she considered testimony from William Wantz, a former Flowserve employee, when determining that the Flowserve Pumps were based on the Worthington design.  Hodgson Dep. at 125.  Wantz worked at Flowserve and its predecessor companies for over forty years.  [Dkt. 141-9 (Wantz Dep.) at 16-20.]  As an employee, Wants worked as a machinist, "designed the tooling and fixturing . . . that was needed to machine the parts," worked as a

pump assembler, inspected parts and completed pumps, and also worked in warranty customer service during his tenure at Flowserve and its predecessors. Id. Wantz testified that, based on his experience at the company, he "know[s] they based [the Flowserve Pumps] off of the [Worthington pump] and made it so that it could be used dry pit or wet pit. . . . They changed the hydraulics on it, I believe. But I'm not an engineer." Id. at 28.

However, Ryan Malooly, Flowserve's designated corporate representative, testified at his deposition that the Flowserve pumps did not use the same design as the Worthington pumps. Hodgson Dep. at 126. Hodgson explained that she found Malooly's testimony not credible because he "vehemently denied" that the Pumps used the old Worthington model. Id. at 128. She explained that when Malooly gave that testimony, he was "animated" and "sp[oke] louder" and "repeat[ed] himself," which she interpreted as "little red flags." Id. Hodgson testified that other deponents also testified "vehemently" that the Flowserve Pumps did not use the Worthington model. Id. at 128-29. By contrast, Hodgson credited Wantz's testimony because, as an ex-Flowserve employee, she found he "would feel more free[] than someone that still works there." Id. at 126. Hodgson also found persuasive that Wantz, unlike Malooly, worked at Flowserve when the Pump was designed. Id.

The Court finds that Hodgson did not simply disregard Malooly's testimony in order to arrive at her conclusion that the Pumps were based on a Worthington design. Rather, in addition to considering testimony from Flowserve employees and representatives, Hodgson employed her expertise to compare cross-

sectional drawings of the two pumps. Hodgson did not impermissibly fail to consider relevant evidence; her conclusion was based on her own observations, and was merely bolstered by the testimony of Wantz and Deluca. Flowserve's argument that this was impermissible is unpersuasive. Hodgson decided whose statements she would credit based on her professional judgment, which is wholly proper. *See, e.g.*, *Zuchowicz v. United States,* 140 F.3d 381, 385-87 (2d Cir. 1998). To the extent, if at all, her judgment was flawed, such flaws go to the weight the trier of fact would give to her opinion, not its admissibility.

Flowserve's second argument fares better. Flowserve asserts Hodgson failed to consider all relevant facts and data because she admitted she did not review the deposition transcripts of most witnesses in this case, the daily log books recording Pump operation, the preventative maintenance records, or OMI's daily round checklists before rendering her opinions. [Dkt. 122 at 18]; Hodgson Dep. at 251-54 (stating she reviewed portions of Shawn Jennings and Lisa Burns' deposition testimony and attended all Flowserve depositions, and that she received information from Ms. Burns and Mr. Kolb about "what the operators said and what Flowserve's responsibilities were").

WPCA disputes Flowserve's argument that Hodgson did not review adequate evidence in preparing her report. [Dkt. 141 at 5.] WPCA points out that, while Hodgson did not review all deposition transcripts in this case, she attended all "critical" depositions in person or by phone. Id. (citing Hodgson Dep. at 253 (stating she attended all Flowserve depositions). WPCA also notes that "literally tens of thousands of documents" were produced in this case, and asserts the

fact that Hodgson did not review all of them goes to the weight of her opinions, not their admissibility. Id. While Hodgson did not review the daily operation and maintenance records for the Pumps, WPCA notes that she reviewed the WPCA facility's operating procedures, toured the WPCA facility, and asked a pump operator about the difference between the pipes at the facility and the "troubles that were had." Hodgson Dep. at 135-38. She did not memorialize that conversation. Id.

A key issue in this case is whether the Pumps' failure was the result of a design defect or whether WPCA negligently operated or maintained the Pumps. [Dkt. 122.] Hodgson gathered some information relating to Pump operation, including reviewing applicable operating procedures and interviewing a pump operator, Hodgson failed to review however evidence of actual daily Pump operation and maintenance. Without such information, Hodgson cannot render a reliable opinion that the Pumps were not negligently operated or maintained. Hodgson's conclusion, absent consideration of this data, lacks a "sufficiently reliable foundation" to be admissible under Federal Rule of Evidence 702. See Amorgianos, 303 F.3d at 265-66; Innis Arden Golf Club v. Pitney Bowes, Inc., 629 F. Supp. 2d 175, 189 (D. Conn. 2009) (excluding expert who did not consider alternative explanations and failed to review evidence which may have supported an alternative explanation, finding that failure constituted a flawed methodology). Hodgson's opinion is based on an analysis which failed to consider all relevant facts and data; accordingly, the Court will not credit her conclusion that the

Pumps failed as a result of a design defect rather than WPCA's negligent operation or maintenance of the system.

### 3. Reliance on Undisclosed Facts

Finally, Flowserve asserts Hodgson relied on facts and calculations not disclosed to Flowserve as the basis for her conclusions.  The Supreme Court has identified a number of factors bearing on reliability that district courts may consider, such as (1) whether a theory or technique "can be (and has been) tested," (2) "whether the theory or technique has been subjected to peer review and publication," (3) a technique's "known or potential rate of error," and "the existence and maintenance of standards controlling the technique's operation," and (4) whether a particular technique or theory has gained "general acceptance" in the relevant scientific community.  Daubert, 509 U.S. at 593-94; see also Fed. Deposit Ins. Corp. v. Suna Assocs., Inc., 80 F.3d 681, 687 (2d Cir. 1996) (discussing Daubert factors).

"In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand."  Id.  In order for a Court to determine the admissibility of expert opinions, the party offering the expert must disclose the bases for those opinion.  United States v. Ulbricht, 858 F.3d 71, 115 (2d Cir. 2017) (upholding exclusion of an expert where the offering party failed to disclose the basis for experts' opinions or the methods used to arrive at their conclusions).

Here, Flowserve notes that, while Hodgson's initial and rebuttal reports refer to calculations, she presents no actual calculations in support of her findings.  [Dkt. 122 at 22.]  WPCA does not dispute that Hodgson did not include calculations in her report, but asserts that Hodgson "has analyzed the data Flowserve provided" and "applied the same principles and followed the same methodology she used when performing forensic pump evaluations for DuPont and Westinghouse for over twenty years."  [Dkt. 141 at 8.]

As WPCA asserts, Hodgson testified that there are no calculations in her report because "Flowserve's expert opinion report has the numbers in there. Also we were provided the drawings that you use to make th[ese] calculations from Flowserve."  Hodgson Dep. at 178.  Hodgson's failure to disclose the calculations and data on which her opinions are based renders her opinions inadmissible.  Ulbricht, 858 F.3d at 115; Innis Arden Golf Club, 629 F. Supp. 2d at 190 (excluding expert who did not disclose analytical data relied upon in reaching his conclusion, finding that omission rendered the expert's methods and opinions unverifiable).  Without those calculations, the Court cannot determine whether her analysis is generally accepted in the scientific community, nor can Flowserve rebut Hodgson's conclusions, and Hodgson's opinion must be excluded.  See Daubert, 509 U.S. at 593-94; Innis Arden Golf Club, 629 F. Supp. 2d at 190.  For the reasons stated above, Flowserve's motion to exclude Hodgson's report and testimony is GRANTED.

D. Summary of Bonneau Dickson's Report

WPCA also offers the expert report of Bonneau Dickson, which Flowserve moves to exclude.  Mr. Dickson, a professional consulting engineer, has "over forty years of professional engineering experience on water and wastewater pump stations, treatment plants and water distribution and sewage collection systems."  [Dkt. 127-2 (Dickson Report) at 3.]  He has a bachelor's degree in civil engineering from Georgia Tech, master's degrees in sanitary engineering from Georgia Tech and Harvard University, and an MBA from the Harvard Business School.  Id.  He has been a registered civil engineer in California since 1970.  Id.

Dickson has "participated in the design of approximately 300 water, wastewater and stormwater projects, ranging in size from a single septic tank or well to a 120 MGD pure oxygen wastewater treatment plant," and was the project manager for "many" of those projects.  Id. at 16.  Among those projects, he has worked on 50 wastewater treatment facilities.  Id. at 20.  He has also participated in the construction of approximately 20 water and wastewater projects, and served as resident engineer on an unidentified number of those projects.  Id.  He has also been the project manager for approximately 175 projects, was the operations manager for a 150-person engineering firm.  Id. at 17.  Dickson has served as a forensic technical consultant, expert witness, or claims analyst on over 100 projects.  Id.  He has been self-employed as an independent consulting sanitary engineer since 1993.  Id. at 18.

Dickson's expert opinions are: (1) the decision to replace the Pumps was justified; (2) WPCA sustained damages as a result of replacing the Pumps; and (3) even if the Pumps did not warrant replacement, there would have been

significant additional maintenance and operating costs to keep them running.  Id. at 4.  WPCA clarifies in its opposition to Flowserve's motion for summary judgment that Dickson's opinion "explained that the WPCA would have incurred additional costs if it had kept operating the Flowserve pumps," which was "one of the factors the WPCA had to consider in deciding whether to replace the pumps." [Dkt. 145 at 24.]

Dickson asserted WPCA was justified in fearing that the Flowserve Pumps would fail in the future and deciding to replace them.  In support, Dickson summarized prior issues with the Pumps, including: (i) the 2012 storm, during which all six Pumps ran simultaneously and the WPCA facility experienced a sewage overflow; (ii) the 2013 incident when Pump One was run dry, "tripped out on high motor temperature" and required maintenance; (iii) the 2013 discovery that some of the Pumps had contaminated coolant, indicating a seal failure; (iv) the 2014 discovery that the pressure sensors were improperly set; and (v) the 2014 incident when Pump One failed because the stator was grounded and required replacement.  Id. at 4-5.

Dickson also asserted, like Hodgson, that the Pumps were modeled after older Worthington Pumps.  Id. at 6.   Dickson came to this conclusion based on the fact that Worthington is a predecessor of Flowserve as well as unidentified Flowserve employees' statements that the Pumps were Worthington pumps.  Id. Based on this information, Dickson concluded that "the Flowserve pumps are of a very old design and the Flowserve technology has not been upgraded for

decades." Id. Dickson opined this older design further justified WPCA's decision to replace the Pumps.

In addition, Dickson asserted he reviewed a cutaway drawing of a Flowserve pump and discovered that the positioning of the pump casing could allow a gas pocket to form in the pump, which "might not allow the liquid in the pump to cool the lower (primary) seal, [which] might allow the seal to become very hot." Id. at 7. If the pump were started and cold water suddenly came into contact with the hot seal, it "might . . . cause [the seal] to fail catastrophically." Id. at 7-8. Dickson opined this design suggested the Flowserve Pumps would fail again in the future and further justified WPCA's decision to replace them. Id

Dickson also opined that WPCA was justifiably concerned that Flowserve would provide inadequate customer assistance in the future. Id. at 9. In support of that assertion, Dickson summarized 2013 and 2014 communications between Flowserve and WPCA in which Flowserve asserted the Pumps failed because they ran dry and then "in essence abandoned the project and provided little or no meaningful further assistance to the WPCA in attempting to understand and remedy the problems." Id. at 8. Dickson opined that Flowserve's "lack of technical support increased the WPCA's concern that the pumps would continue to have problems that would not be addressed and would result in more pump failures." Id. at 9.

In addition, Dickson opined that "WPCA is extremely sensitive to the risk of a sewage spill and justifiably so." Id. at 9. Dickson explained the WPCA facility's proximity to the Norwalk River and Maritime Aquarium and Oyster Shell Park, the

annual revenue of the local commercial shell fishing industry, and the potential impact of a sewage spill on other recreational marinas nearby. Id. Dickson opined that, if a sewage spill occurred, WPCA would face a "significant risk of major fines." Id. at 10. Accordingly, Dickson found WPCA justified in its decision to replace the Pumps. Id.

Dickson also opined that WPCA sustained damages in having to replace the Pumps. Id. In support, Dickson cited a report by CDMS dated November 14, 2014, which estimated that the cost of continuing to use the Pumps would be $2,269,000. Id. at 10. However, Dickson noted that CDMS's calculation did not consider extra operating costs for the Pumps to remedy issues that were "just beginning to be discovered at the time that CDMS wrote the 11/14/2014 report." Id. By contrast, the cost of replacing the Pumps was estimated to be $2,797,000. Id. In fact, a report estimated the total construction cost of the replacement project to be $4,306,500, which "included some betterments, such as HVAC improvements." Id. at 10. Dickson noted that WPCA decided to replace the Flowserve pumps despite the higher cost of doing so, "because of the risks and uncertainties of continuing with the Flowserve pumps." Id.

Finally, Dickson opined that if WPCA had not replaced the Pumps, it would have sustained significant additional maintenance and operating costs to keep them running. Dickson opined that maintenance costs for the Pumps would include overhauls performed by AEM every two years, the potential addition of pump motor monitoring sensors to reduce the potential for pump damage, the

advisability of purchasing extra Pumps as "spares" in case of Pump failure, and the installation of air release systems.  Id. at 12.

In addition, Dickson calculated that operating costs for the Flowserve Pumps would include weekly checks of the coolant level and inspections for contamination.  Id.  Dickson also assumed the Pumps' glycol would have to be refilled every other month, assumed the coolant would be contaminated and require replacement every other month, assumed the bearings would need to be re-greased, air would need to be bled out of the Pumps, and that Pumps would need to be taken out of service once per week for inspection upon signs of trouble.  Id. at 13.  Dickson estimated that these extra maintenance and operational needs would raise the cost of continuing to use the Pumps to $2,750,123 over a twenty-year lifespan.  Id.

E.  Analysis: Motion to Exclude Dickson

Flowserve moves to exclude Dickson's expert report for lack of an analysis rooted in acceptable methodology.  [Dkt. 127.]  As stated above, "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert."  Amorgianos, 303 F.3d at 267.  If an expert opinion inefficiently explains the basis for its conclusion, a "court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."  Id.

Here, Flowserve asserts Dickson's opinions impermissibly rely on assumptions with no factual support or expert analysis.  [Dkt. 127.]  WPCA responds that Dickson's opinions are based on his expertise weighing the

environmental and financial risk associated with leaving the Pumps in place. [Dkt. 144.] Specifically, WPCA asserts Dickson's calculation of anticipated future maintenance and operating costs for the Pumps "used his specialized knowledge to provide information that the jury would otherwise not be able to deduce." Id. at 7-8.

The Court finds that Dickson's expert report lacks a sufficient explanation of reliable methodology. It is conceivable that Dickson, who has spent decades in the field of wastewater treatment facility design, is familiar with the general costs of maintenance and operation of wastewater treatment pumps. However, Dickson's report does not explain how he arrived at his calculations concerning what maintenance the Pumps would require, how often, and how much that maintenance would cost. In fact, Dickson's report is rife with assumptions and estimates without any explanation of their basis. Dickson's estimates regarding the future cost of keeping the Flowserve Pumps are based on speculation and conjecture, and lack the "level of intellectual rigor that characterizes the practice of an expert." Kumho Tire Co., 526 U.S. at 152; see also, e.g. Duchimaza, 2016 WL 5799295 at *5 (excluding an expert who drew conclusions based on a review of the record and failed to conduct an analysis of that evidence beyond the ability of a layperson with basic mathematical skills).

In addition, when Dickson was questioned about how he arrived at his total calculation of the damages incurred by replacing the Pumps, and why that total was higher than the damages he concluded were caused by the Pumps, he explained that the date he finalized his report, "somebody telephoned me,

perhaps Mr. Orenstein [one of WPCA's attorneys], and said there was another $13,994.20 in the betterments [provided by the replacement pumps], and so I got this number based off somebody telling me that that much should be added to it." [Dkt. 127-3 (Dickson Dep. at 165.] Dickson testified he did not conduct any calculations or research to confirm that number, and does not know what is included in that number. Id. Dickson's reliance on Mr. Orenstein's opinion as to the total value of betterments, absent any expert analysis by Dickson, is a mere transmission of hearsay which cannot constitute an admissible expert opinion. Mejia, 545 F.3d at 197 (excluding an expert who simply "transmit[ted] . . . hearsay to the jury" without conducting any expert analysis of those hearsay statements).

Dickson's opinion regarding the potential environmental impact of keeping the Pumps is equally devoid of acceptable basis. Dickson testified at his deposition that he learned of the "risk" of sewage spills from WPCA representatives and internet research. [Dkt. 127-3 (Dickson Dep.) at 87.] Specifically, Dickson testified that his conclusion that the WPCA was justifiably sensitive to the risk of a sewage spill was based on "conversations with Ms. Burns and Mr. Kolb," who "talked about the importance of the environmental quality of Norwalk Harbor." Id. Dickson testified he thought WPCA's concern was justified "because of the damage that could be done, potential for large fines, bad publicity." Id. Dickson testified that his discussion in his report about the Norwalk River and Harbor "came from online . . . I think the shellfish thing was -- they told me it was a shellfish industry and I believe I found that online as well." Id. at 88.

Dickson does not purport to be an expert in environmental impact, and offers no acceptable scientific analysis supporting his environment-related opinions.  Dickson's admitted internet research is not an acceptable basis for an expert opinion.  Andrews v. Metro N. Commuter R. Co., 882 F.2d 705-708 (2d Cir. 1989) ("expert testimony is inadmissible when it addresses lay matters which a jury is capable of understanding and deciding without the expert's help.").  Nor is his admitted reliance on WPCA representatives' statements.  Mejia, 545 F.3d at 197 (stating an expert may not simply "transmit . . . hearsay to the jury").

For the reasons set forth above, Dickson's report is not based in acceptable methodology or analysis, and is inadmissible.  Flowserve's motion to exclude Dickson's expert report is GRANTED.

## IV. Motions for Summary Judgment

The Court next considers the Motions for Summary Judgment.

## A. Standard of Review

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  The court should state on the record the reasons for granting or denying the motion."  Fed. R. Civ. P. 56(a).  In order to prevail, the moving party must sustain the burden of proving that no factual issues exist. Vivenzio v. City of Syracuse, 611 F.3d 98, 106 (2d Cir. 2010).  "In determining whether that burden has been met, the court is required to resolve all ambiguities

and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought.  Id.  (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied."  Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH, 446 F.3d 313, 315-16 (2d Cir. 2006) (quotation omitted).  In addition, "the court should not weigh evidence or assess the credibility of witnesses" on a motion for summary judgment, as "these determinations are within the sole province of the jury."  Hayes v. New York City Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996).

"A party opposing summary judgment 'cannot defeat the motion by relying on the allegations in [her] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.'  At the summary judgment stage of the proceeding, [p]laintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient."  Welch-Rubin v. Sandals Corp., No. 3:03-cv-481, 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (quoting Gottlieb v. County of Orange, 84 F.3d 511, 518 (2d Cir. 1996)).  "Summary judgment cannot be defeated by the presentation . . . of but a 'scintilla of evidence' supporting [a] claim."  Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 726 (2d Cir. 2010) (quoting Anderson, 477 U.S. at 251).

A court must make the threshold determination of whether there is the need for a trial—whether, in other words, there are any genuine factual issues

that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party. Anderson, 477 U.S. at 250. Judges are not required "to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party. Formerly it was held that if there was what is called a scintilla of evidence in support of a case the judge was bound to leave it to the jury, but recent decisions of high authority have established a more reasonable rule, that in every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." Anderson, 477 U.S. at 251 (citing Pennsylvania R. Co. v. Chamberlain, 288 U.S. 333, 343 (1933); Coughran v. Bigelow, 164 U.S. 301, 307 (1896)).

"A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). A party may also support their assertion by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Id. Cited documents must consist of either "(1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial." Local R. Civ. P. 56(a)3; see also Fed. R. Civ. P. 56(c)(4).

The Court need not consider any materials that the parties have failed to cite, but may in its discretion consider other materials in the record. Fed. R. Civ. P. 56(c)(3). If a party fails to properly support an assertion of fact, or fails to properly address another party's assertion of fact, the Court may grant summary judgment on the basis of the undisputed facts. D. Conn. L. Rule 56(a)(3) (stating that "failure to provide specific citations to evidence in the record as required by this Local Rule may result in the Court deeming certain facts that are supported by the evidence admitted in accordance with [Local] Rule 56(a)(1) or in the Court imposing sanctions, including . . . an order granting the motion if the undisputed facts show that the movant is entitled to judgment as a matter of law").

C.     **Analysis: Flowserve's Motion for Summary Judgment against WPCA**

Flowserve moves for summary judgment as to all seven of WPCA's claims against it. The Court addresses each in turn.

i.     **Counts One and Two: Strict Products Liability and Negligence Arising out of Products Liability**

Flowserve moves for summary judgment as to Counts One and Two of WPCA's Third Amended Complaint, which allege liability due to defective Pump design. [Dkt. 129 at 12.]

"All [products liability] claims, whether alleging a design defect, manufacturing defect or failure to warn defect, are governed by the same elements that this court has applied since it adopted § 402A:

(1) the defendant was engaged in the business of selling the product;
(2) the product was in a defective condition unreasonably dangerous to the consumer or user;
(3) the defect caused the injury for which compensation was sought;

(4) the defect existed at the time of the sale; and
(5) the product was expected to and did reach the consumer without substantial change in condition."

*Bifolck v. Philip Morris*, 324 Conn. 402, 433–36 (2016) (citing *Izzarelli v. R.J. Reynolds Tobacco Co.*, *supra*, 321 Conn. at 184–85, 136 A.3d 1232).

Step two of the analysis, the "unreasonably dangerous" test, requires the application of either (1) the risk-utility test (formerly called the modified consumer expectation standard) or (2) the consumer expectation standard. Id. Connecticut determined which test applies in Izzarelli v. Reynolds Tobacco Co., 321 Conn. 172 (2016): "The [risk-utility or] modified consumer expectation test is our primary test. The ordinary consumer expectation test is reserved for cases in which the product failed to meet the ordinary consumer's minimum safety expectations, such as res ipsa type cases. Id. at 194.

Connecticut elaborated on what is required of the two tests a few months later in Bifolck v. Philip Morris, 324 Conn. 402, 433–36 (2016): "For a strict liability claim alleging design defect, the plaintiff may prove this element under the risk-utility test or under the consumer expectation test. Under the risk-utility test, which will govern most cases, a product is in a defective condition unreasonably dangerous to the consumer or user if:

(1) A reasonable alternative design was available that would have avoided or reduced the risk of harm and the absence of that alternative design renders the product unreasonably dangerous. In considering whether there is a reasonable alternative design, the jury must consider the feasibility of the alternative. Other relevant factors that a jury may consider include, but are not limited to, the ability of the alternative design to reduce the product's danger without unreasonably impairing its usefulness, longevity, maintenance, and esthetics, without unreasonably increasing cost, and without creating other equal or greater risks of danger; or

**(2) The product is a manifestly unreasonable design in that the risk of harm so clearly exceeds the product's utility that a reasonable consumer, informed of those risks and utility, would not purchase the product. The factors that a jury may consider include, but are not limited to, the magnitude and probability of the risk of harm, the instructions and warnings accompanying the product, the utility of the product in relation to the range of consumer choices among products, and the nature and strength of consumer expectations regarding the product, including expectations arising from product portrayal and marketing.**

Under either approach to the risk-utility test, the fact finder considers whether the risk of danger inherent in the challenged design outweighs the benefits of that design.  Id. at 433–36.

Alternatively, in res ipsa loquitor cases, where the consumer expectation test applies, a product is in a defective condition unreasonably dangerous to the consumer or user only if it is "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics."  Id. (citing 2 Restatement (Second), supra, § 402A, comment (i), p. 352). The product must fail to meet legitimate, commonly held, minimum safety expectations of that product when used in an intended or reasonably foreseeable manner. Those expectations may be informed by consumers' experience with the product, the seller's express representations, and product safety laws.  Id.

As the Second Circuit observed, the "Connecticut Supreme Court has made it clear that in product liability actions, a jury may, under appropriate circumstances, infer a defect from the evidence without the necessity of expert testimony."  Sanders v. Fireline, Inc., 295 F. App'x 373, 374 (2d Cir. 2008) (quoting Potter v. Chicago Pneumatic Tool Co., 241 Conn. 199, 218 (1997)).

"Expert testimony is unnecessary if all the primary facts can be accurately and intelligibly described to the jury, and if they . . . are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training, experience, or observation in respect of the subject under investigation."  Id. (quoting Salem v. U.S. Lines Co., 370 U.S. 31, 35 (1962)).

"Where, however, the nexus between the injury and the alleged cause would not be obvious to the lay juror, expert evidence is often required to establish the causal connection between the accident and some item of physical or mental injury."  Id. (quoting Wills v. Amerada Hess Corp., 379 F.3d 32, 46 (2d Cir.2004)).  "Putting forth expert testimony or evidence of some kind to establish a genuine issue of material fact is especially important when, as is the case here, the plaintiff attempts to assert a design defect claim."  Walters v. Howmedica Osteonics Corp., 676 F. Supp. 2d 44, 50 (D. Conn. 2009); Koger v. Synthes North America, Inc., No. 3:07–CV–01158 (WWE), 2009 WL 5110780, at *2 (D. Conn. Dec.17, 2009); Kuzmech v. Werner Ladder Co., 3:10-cv-266 (VLB), 2012 WL 6093898, at *11 (D. Conn. Dec. 7, 2012).

Flowserve first asserts WPCA cannot assert products liability without its expert, Hodgson.  [Dkt. 129 at 16.]  Flowserve next asserts the defects WPCA identifies are issues with the design of the WPCA plant and the pump specifications created by project engineer CDMS, rather than issues with the design of the Pumps.  Id.  Finally, Flowserve asserts WPCA does not offer an alternative design within the scope of the WPCA Project specifications, and

accordingly offers no feasible alternative.  Id. at 17 (citing Bifolck, 152 A.3d at 1203).

WPCA does not address each of Flowserve's arguments, but rather responds that Flowserve should have advised WPCA if the pumps required under the Project specifications were insufficient, and should have provided pumps that did not bear the alleged defects Hodgson identified.  [Dkt. 145 at 20.]

First, the Court agrees with Flowserve that this is the type of complex case which requires an expert opinion as to defect and as to feasible alternative design.  This case, involving the requirements of a pump for a wastewater treatment facility, is not one in which a jury would be "as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training."  Sanders, Inc., 295 F. App'x at 374; see also, e.g., Koger, 2009 WL 5110780 at *2 (holding that since implanted medical screws were not within common knowledge plaintiff needed expert evidence to establish screw was defective and the existence of a causal link); Kuzmech, 2012 WL 6093898 at *11 (finding expert evidence required to establish the "physical conditions and engineering principles of when a ladder buckles:").  Accordingly, absent admissible expert testimony, WPCA's claim must fail.

Second, the Court finds compelling Flowserve's argument that the Pumps complied with Project specifications.  While the Connecticut Supreme Court has not yet decided the question, the Connecticut Superior Court has determined that a "manufacturer is not liable for a design defect that causes injury to the

consumer if the product is manufactured according to the designer/buyer's specifications, unless the specifications are obviously dangerous and should not be followed." Rogers v. Budget Truck Rental, LLC, No. HHBCV075003950, 2008 WL 4926698, at *2-3 (Conn. Super. Ct. Oct. 30, 2008) (noting that no other Connecticut court had yet discussed the issue). The Connecticut Superior Court explained that "no public policy can be served by imposing a civil penalty on a manufacturer of specialized parts for a highly technical machine according to the specifications supplied by one who is expert at assembling these technical machines . . . The effect of such a decision on component parts manufacturers would be enormous." Id. (citing Orion Ins. Co. Ltd. v. United Techs. Corp., 502 F. Supp. 173, 178 (E.D. Pa. 1980). Other courts have likewise found that "when a product is manufactured in accordance with plans and specifications provided by the purchaser, the manufacturer is not liable for an injury caused by an alleged design defect in the product, unless the specifications are so patently defective that a manufacturer of ordinary prudence would be placed on notice that the product is dangerous and likely to cause injury." Dalton v. Stedman Machine Co., 2008 WL 351676, at *4 (N.D.N.Y. Feb. 7, 2008) (discussing New York law); see also Thompson v. Hirano Tecseed Co., Ltd., 456 F.3d 805,809 (8th Cir. 2006) (collecting cases establishing that the same principle is applied in Virginia, Kentucky, Pennsylvania, Maryland, Delaware, Idaho, Michigan, Missouri, and Nebraska).

The evidence indicates that, even considering Hodgson's opinion, WPCA's asserted defects concern the overall wastewater treatment facility design and

CDMS's pump specifications rather than the Pumps themselves. For example, Hodgson opines that the Pumps were defective because the motors were too small. Hodgson Report at 13. However, the Project design specifications required that the motors be no larger than 215 horsepower. [Dkt. 130-11 (CDMS Specifications) at 6.] The specifications include no minimum horsepower. Id. The Pumps had 200 horsepower, and thus abided by the Project specifications. Hodgson Report at 13. Similarly, Hodgson's opinion that the Pumps were defective for failing to provide air vents does not take into account that the Project specifications did not call for those additions. Hodgson Report at 13; CDMS Specifications at 6.

Hodgson asserted the Pumps failed to meet project specifications because they failed to provide equal flow distribution, and because the upper seals and bearings were not adequately lubricated. Hodgson Report at 83-84. However, for the reasons set forth previously, Hodgson's report is inadmissible, and there is no admissible evidence that Flowserve failed to meet the project specifications. Rather, despite Hodgson's opinion, WPCA admitted in its Rule 56(a)(2) statement that CDMS's design specifications were based on Flowserve's MSX Series 3 pumps, and states those specifications "allowed for pumps from Flowserve, Flygt or similar." [Dkt. 146 at 4.] In addition, WPCA's Rule 56(a)(2) statement does not admit that "Flowserve submitted its bid to supply six MSX Series 3 pumps in compliance with CDM Smith's specifications," but rather states "Flowserve did not accept the terms and conditions in the bid package but attempted to negotiate terms not in the bid package." Id. at 7. However, WPCA's summary

judgment briefing states WPCA believes Flowserve negotiated its warranty and limitation of liability provisions, and at no point asserts Flowserve "attempted to negotiate" technical specifications.  Moreover, the recommended design of the wastewater treatment plant was based on the Flowserve MSX Series 3 pumps. [Dkt. 130-4 at 21.]

Further, the specifications in Flowserve's bid state Flowserve will provide six MSX Series 3 pumps, and that "Flowserve will not be responsible for the design, arrangement, and operation of the supporting structure for the assembled pumping unit."  [Dkt. 130-15 at 12-13.]  Even if Flowserve had not disclaimed responsibility for the design of the structure which would surround the Pumps, there is no evidence that Flowserve was provided with CDMS's specifications for the entire WPCA facility.  Rather, the specifications Flowserve received concerned only the vertical non-clog dry pit submersible pumps.  [Dkt. 130-11.]

WPCA had an opportunity to discuss Flowserve's bid, which contemplated the use of MSX Series 3 pumps, at a scope of review meeting in which Gilbane and Flowserve participated, but WPCA chose not to attend that meeting.  [Dkt. 130-14 at 113-16.]  WPCA ultimately certified Flowserve's bid to provide MSX Series 3 pumps (Dkt. 120-38 at 1) and WPCA accepted the Pumps upon installation and testing in 2012.  [Dkt. 120-5 at 154-55.]  Admissible record evidence indicates Flowserve's Pumps met WPCA's design specifications, and that WPCA cannot defeat summary judgment on its products liability claim.

Finally, WPA has not established that a reasonable alternative pump design was available.  Hodgson's report, even if admitted, does not identify a reasonable

alternative. Rather, Hodgson's report opines that WPCA should have used Flygt pumps, which have larger motors. However, the Flygt motors would have required an expensive reworking of the system as a whole, and were considered and rejected by WPCA during the bidding process. [Dkt. 130-3 at 33 (stating WPCA did not choose Flygt pumps because they would have required "hundreds of thousands of dollars' worth of changes in order to bring them to the point where [those pumps] could be installed on the project").] WPCA has offered no evidence that a "reasonable alternative design was available" for pumps that would meet the WPCA system specifications "that would have avoided or reduced the risk of harm" without "unreasonably increasing cost." Bifolck, 324 Conn. at 433 (explaining that a plaintiff in a design defect case must "proffer sufficient evidence from which a jury could reasonably conclude that any increase in cost would not materially affect the desirability of the product in light of the benefit derived"); Izzarelli v. R.J. Reynolds Tobacco Co., 321 Conn. 172, 208 (Conn. 2016) (stating the jury must weigh the mechanical feasibility and cost of an alternative design); White v. Mazda Motor of Am., Inc., 313 Conn. 610 (Conn. 2014) (same).

WPCA has failed to offer admissible expert testimony in support of its products liability claims, and has not raised a material question of fact as to whether Flowserve met CDMS's design specifications and whether a feasible alternative design was available. Accordingly, Flowserve's motion for summary judgment as to Counts One and Two of WPCA's Third Amended Complaint is GRANTED.

ii. <u>**Count Three: Breach of Express Warranty Arising out of Products Liability**</u>

**Flowserve also moves for summary judgment on WPCA's breach of express warranty claim. [Dkt. 129 at 34.]**

**Courts have held that "because the CPLA is silent as to the elements of a cause of action for breach of warranty," plaintiffs may rely on the Connecticut Uniform Commercial Code, Title 42a of the Connecticut General Statutes ("CUCC"). Kuzmech, 2012 WL 6093898, at \*\*12-13; Johnson v. Sears Roebuck & Co., No.3:05–cv–139(JCH), 2007 WL 2491897, at \*4 (D. Conn. Aug. 29, 2007).**

**An express warranty is created as follows: "(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain, creates an express warranty that the goods shall conform to the affirmation or promise; (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description; (c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the good shall conform to the sample or model." Conn. Gen. Stat. § 42a–2–313(1); Johnson, 2007 WL 2491897, at \*4.**

**"For both express and implied warranties, a plaintiff has the burden of proving causation." Johnson, 2007 WL 2491897, at \*4 (citing Conn. Gen. Stat. § 52–572n(a)); Blockhead, 402 F. Supp. at 1024 ("In a breach of warranty action, a plaintiff may recover only after demonstrating that a warranty existed, that defendant breached the warranty, and that the breach was the proximate cause of the loss sustained.").**

"[P]arties are . . . free to shape their remedies to their particular requirements and reasonable agreements limiting or modifying remedies are to be given effect."  Comind, Companhia de Seguros v. Sikorsky Aircraft Div. of United Techs. Corp., 116 F.R.D. 397, 412 (D. Conn. Jan. 14, 1987) (citing comment to Conn. Gen. Stat. § 42a-2-719)).  Clauses restricting a party's remedies are enforceable unless unreasonable.  Latham & Assoc., Inc. v. William Raveis Real Estate, Inc., 218 Conn. 297, 308 (Conn. 1991); see also Conn. Gen. Stat. § 42a-2-302(1) (stating the court may refuse to enforce a contract only if its terms are unconscionable); Comind, Companhia de Seguros v. Sikorsky Aircraft Div. of United Techs. Corp., 116 F.R.D. 397, 412 (D. Conn. Jan. 14, 1987) (explaining that a restriction on warranties is unenforceable "where the remedy agreed to be the sole remedy cannot yield the relief it purports to give, and thus cannot accomplish its essential purpose of providing at least a minimum adequate remedy").  "[B]oth express and implied warranties may be effectively disclaimed by sufficiently specific language."  Beech Aircraft Corp. v. Flexible Tubing Corp., 270 F. Supp. 548, 561 (D. Conn. 1967).

WPCA asserts that Flowserve breached the Certification of Functionality in its initial bid submittal, which states:

> Flowserve certifies that the pumps being supplied on the subject order shall function properly, as long as the discharge and suction piping being supplied by the contractor is coordinated properly with the pumps being supplied.

[Dkt. 146-12 at 25.]  WPCA asserts that Flowserve does not argue the discharge and suction piping were coordinated improperly, and asserts it is undisputed that at least some of the Pumps suffered a catastrophic failure in August 2013.  WPCA

asserts this failure constitutes a genuine issue of material fact as to whether the Pumps were able to function properly within the WPCA system.  [Dkt. 145 at 26-27.]

Flowserve replies that the only express warranty Flowserve made "warrants at time of shipment to Gilbane Building Company its Equipment will comply with applicable [Flowserve] drawings and will be free from defects in workmanship and material."  [Dkt. 130-19 (Purchase Order) at 1.]

The final agreement, dated December 2, 2010, includes the warranty against defects in workmanship and material which Flowserve cites.  [Dkt. 130-19 (Purchase Order) at 1.]  The agreement also states "any equipment and parts supplied by [Flowserve] but manufactured by third parties carry the warranty that the manufacturer of such equipment and parts conveyed to [Flowserve] which can be passed on to Gilbane Building Company."  Id.  The agreement also states, in all capital letters, "THESE WARRANTIES ARE EXCLUSIVE AND IN LIEU OF ALL OTHER WARRANTIES, WHETHER WRITTEN, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, INCLUDING BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY, AND FITNESS FOR A PARTICULAR PURPOSE."  Id. at 3. The certification of functionality appearing in Flowserve's earlier submittal, dated July 9, 2010, is not included among the express warranties in the final agreement, and is disclaimed under the plain terms of the final agreement.  Id.; [Dkt. 146-12 at 2 (showing date of prior submittal).]

The final agreement included pro-rated warranties to repair and replace the Pumps if any injury arose due to a defect in workmanship or materials, and

accordingly does not leave WPCA without a "minimum" remedy.  Purchase Order
at 4; compare with Comind, Companhia de Seguros, 116 F.R.D. at 412 (finding a
limitation of liability unreasonable where it only allowed for recovery of 1/16th of
the cost of the product in question).  The disclaimer in the final agreement is
clear, conspicuous, and enforceable.  Latham & Assoc., Inc.., 218 Conn. at 308
(Conn. 1991).  Flowserve's motion for summary judgment on Count Three of
WPCA's Third Amended Complaint is GRANTED.

### iii. Counts Four and Five: Breach of Implied Warranties of Merchantability and Fitness

Similarly, Flowserve moves for summary judgment as to Counts Four and
Five of WPCA's Third Amended Complaint because the executed purchase order
contract for the Pumps expressly excluded any and all implied warranties.  [Dkt.
129 at 11.]

"The CUCC defines implied warranties in two provisions.  Connecticut
General Statute section 42a–2–315 provides: '[w]here the seller at the time of
contracting has reason to know any particular purpose for which the goods are
required and that the buyer is relying on the seller's skill or judgment to select or
furnish suitable goods, there is unless excluded or modified under section 42a–
2–316 an implied warranty that the goods shall be fit for such purpose."  Walters,
676 F.Supp.2d at 55 (quoting Conn. Gen. Stat. § 42a–2–315).  In addition,
"Connecticut General Statute section 42a–2–314 provides: '[u]nless excluded or
modified as provided by section 42a–2–316, a warranty that the goods shall be
merchantable is implied in a contract with respect to goods of that kind."
Id. (quoting Conn. Gen. Stat. § 42a–2–314). "This implied warranty of

merchantability 'acts as a guarantee by the seller that his goods are fit for the ordinary purposes for which they are to be used and will pass in the trade without objections." Id. (quoting Blockhead, Inc. v. Plastic Forming Co., Inc., 402 F. Supp. 1017, 1025 (D. Conn. 1975)).

However, an implied warranty may be disclaimed, and such disclaimer is enforceable if it is "conspicuously placed in large type." See, e.g., Web Press Servs. Corp. v. New London Motors, Inc., 203 Conn. 342, 353 (Conn. 1987). "To exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that 'There are no warranties which extend beyond the description on the face hereof.'" Conn. Gen. Stat. § 42a-2-316(2).

The relevant language in the final purchase order in this case states:

These warranties are exclusive and in lieu of all other warranties, whether written, express, implied, statutory, or otherwise, including but not limited to the implied warranties of merchantability, and fitness for a particular purpose.

[Dkt. 130-15 at 16.] Flowserve asserts this language is adequately conspicuous and specific to be enforceable under Conn. Gen. Stat. § 42a-2-316(2). See, e.g., Web Press Servs. Corp. v. New London Motors, Inc., 525 A.2d 57, 63 (Conn. 1987) (finding no implied warranty of merchantability existed where the purchase order explicitly disclaimed such a warranty). WPCA does not dispute that the disclaimer language is adequately conspicuous, but rather asserts it did not

authorize Gilbane to enter into an agreement with such a disclaimer, and thus the disclaimer must be void.  The Court must accordingly consider whether Gilbane was authorized to enter into the agreement with Flowserve.

"[I]t is a general rule of agency law that the principal in an agency relationship is bound by, and liable for, the acts in which his agent engages with authority from the principal, and within the scope of the agent's employment. . . . An agent's authority may be actual or apparent. . . . Actual authority exists when [an agent's] action [is] expressly authorized . . . or . . . although not authorized, [is] subsequently ratified by the [principal]."  Ackerman v. Sobol Family P'ship, LLP, 298 Conn. 495, 508–09 (2010) (citing Maharishi School of Vedic Sciences, Inc. v. Connecticut Constitution Assocs. Ltd. P'ship, 260 Conn. 598, 606–607 (2002)).

In contrast, "[a]pparent authority is that semblance of authority which a principal, through his own acts or inadvertences, causes or allows third persons to believe his agent possesses. . . . Consequently, apparent authority is to be determined, not by the agent's own acts, but by the acts of the agent's principal. . . . The issue of apparent authority is one of fact to be determined based on two criteria. . . . First, it must appear from the principal's conduct that the principal held the agent out as possessing sufficient authority to embrace the act in question, or knowingly permitted [the agent] to act as having such authority. . . . Second, the party dealing with the agent must have, acting in good faith, reasonably believed, under all the circumstances, that the agent had the

necessary authority to bind the principal to the agent's action."  Ackerman, 298 Conn. at 498-99.

The evidence indicates WPCA engaged Gilbane to act as its agent in conducting the bidding process for the wastewater facility Project.  [Dkt. 120-4 (Construction Management Contract) at 5 (stating Gilbane "shall obtain competitive bids" for the WPCA Project).]  WPCA has not asserted there is any language in that agreement saying Gilbane may not negotiate certain contract terms with prospective subcontractors, nor has the Court identified such a term. In fact, while the Construction Management Contract states WPCA will provide "draft bid documents that include all contractual terms and other requirements governing the hiring of labor and purchasing of materials in connection with the Work," the agreement also states Gilbane "is responsible for supplementing the bidding documents and making any and all necessary revisions in order for such documents to be appropriate in form and content for public bidding purposes." Id. at 5.  The agreement specifically contemplates Gilbane "analyzing" bids and making "any and all necessary revisions."  Id.  The Court reads the Construction Management Contract to "expressly authorize" Gilbane to negotiate the terms of Flowserve's contract.  Ackerman, 298 Conn. at 508–09.

Even if the Construction Management Contract did limit Gilbane's actual authority to negotiate, there is no evidence that Gilbane did not have apparent authority to negotiate with Flowserve.  Rather, evidence shows that WPCA acted as if Gilbane had authority to negotiate with Flowserve and abstained from opportunities to engage in the negotiations.  For example, WPCA could have

attended the scope review meeting at which Gilbane and Flowserve discussed Flowserve's bid, including the proposed warranties and limitation of liability. [Dkt. 130-16 (Scope Review Meeting Minutes); Dkt. 130-14 at 113-1.]  However, WPCA declined to do so.  Id.  WPCA, through its actions, held Gilbane out to be authorized to negotiate with Flowserve, and there is no record evidence that Gilbane did not in fact believe it was authorized to so negotiate.  There is no question of fact that Gilbane had apparent authority, if not actual authority, to negotiate Flowserve's warranty and limitation of liability clauses.  Ackerman, 298 Conn. at 498-99.

Not only did WPCA grant Gilbane the authority to negotiate the contract with Flowserve, but WPCA's authorized agent also certified Flowserve's warranty and limitation of liability language in the Clean Water Fund application package. That certification states: "the undersigned representative of the applicant certifies that the information contained above and in any attached statements and materials in support thereof is true and correct to his/her knowledge."  Id. at 20-21 (citing Dkt. 120-38 (Clean Water Fund Application) at 1).  It is signed by Harold Alvord, who had authority to grant approvals on behalf of WPCA.  See Construction Management Agreement, Art. 1, ¶ C (stating Harold Alvord has authority to grant approval and authorization on behalf of WPCA).  Even if Gilbane did not have authority to negotiate those terms, WPCA ratified the negotiated contract.  Young v. Data Switch Corp., 231 Conn. 95, 102 (1994) ("[a] corporation may ratify an unauthorized act of its agent by passive acquiescence as well as by affirmative action"); Cmty. Collaborative of Bridgeport, Inc. v.

Ganim, 241 Conn. 546, 560–62, 698 A.2d 245, 254–55 (1997) (explaining that, as a general rule, "[r]atification is defined as the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account.).

For the reasons set forth above, WPCA has not offered a material question of fact as to whether Flowserve's disclaimer of implied warranties was authorized, such that Flowserve should be held liable for breaching those disclaimed warranties. Summary judgment is GRANTED as to Counts Four and Five of WPCA's Third Amended Complaint.

iv. Counts Six and Seven: Third-Party Breach of Contract and Breach of Connecticut's Unfair Trade Practice Act

Flowserve asserts it is entitled to summary judgment on counts Six and Seven because a "product liability claim . . . may be asserted and shall be in lieu of all other claims against product sellers." Conn. Gen. Stat. § 52-572n(a). Connecticut's Products Liability Act is an exclusive remedy, and bars other claims against the product seller unless those other claims allege damages outside the scope of the CTPLA. Gerrity, 818 A.2d 772. For example, a plaintiff may not bring a CUTPA claim where the alleged harm was caused by the defective product, rather than the defendants' misrepresentations. Hubbard-Hall, Inc. v. Monsanto Co., 98 F. Supp. 3d 480, 491 (D. Conn. 2015). Flowserve asserts WPCA's alleged damages arise only out of the Pumps' repair and replacement, and are not distinct from the alleged product defect claim.

WPCA argues its third-party breach of contract and CUTPA claims are not barred by the CTPLA exclusivity provision. [Dkt. 145 at 29.] WPCA asserts

Flowserve did not just provide a defective product – it also failed to provide services, training, and reliable customer service.  Id.

Section 52–572n(a), the exclusivity provision of the CPLA, provides that a product liability claim "as provided" for in the CPLA "may be asserted and shall be in lieu of all other claims against product sellers, including actions of negligence, strict liability and warranty, for harm caused by a product."  The CPLA defines "product liability claims" as "all claims or actions brought for personal injury, death or property damage caused by the manufacture, construction, design, formula, preparation, assembly, installation, testing, warnings, instructions, marketing, packaging, or labeling of any product . . ." and "shall include, but is not limited to, all actions based on the following theories: Strict liability in tort; negligence; breach of warranty, express or implied; breach of or failure to discharge a duty to warn or instruct, whether negligent or innocent; misrepresentation or nondisclosure, whether negligent or innocent." Conn. Gen. Stat. § 52–572m(b).

The Connecticut Supreme Court has instructed that the CPLA is "the exclusive means by which a party may secure a remedy for an injury caused by a defective product."  Gerrity v. R.J. Reynolds Tobacco Co., 263 Conn. 120, 126 (2003).  "The legislature clearly intended to make our products liability act an exclusive remedy for claims falling within its scope."  Winslow v. Lewis–Shepard, Inc., 212 Conn. 462, 471 (1989).

In determining whether a specific cause of action falls within the scope of the CPLA, the Court should examine the nature of the injury alleged and the

alleged act that caused the harm. Gerrity, 263 Conn. at 128 (exclusivity provision was not designed to serve as a bar to additional claims for an injury not caused by the defective product or a claim that is not for personal injury, death or property damage). In Gerrity, for example, the plaintiff's CUTPA claim was preserved because plaintiff alleged financial injury based upon the increased cost of cigarettes that plaintiff had to pay as a result of defendant's wrongful conduct.

Here, WPCA's CPLA claim is alleged according to the product liability theories of strict liability, negligence, and breach of warranty; plaintiff seeks damages attributable to the defective product including the cost of the use of the product, investigation, and replacement. In its contract and CUTPA claims, plaintiff also seeks damages for "injury to its property as a result of [Flowserve's] defective product." Town of Sprague v. Mapei Corp., 2012 WL 1900120, at *2 (D. Conn. May 24, 2012). Those claims are barred by the CPLA's exclusivity clause. Conn. Gen. Stat. 52-572n(1) (stating the CPLA's definition of product liability claims includes all claims for property damage caused by, among other things, design, testing, warnings, and instructions); Fraser, 857 F. Supp. 2d at 258 (citing Hurley v. Heart Physicians, P.C., 278 Conn. 305, 324 (2006)) (stating courts routinely hold that the CPLA's exclusivity provision bars CUTPA claims that "assert that a defendant's product is defectively designed or that the defendant failed to warn properly about a defective product").

Moreover, even if Plaintiffs' CUTPA and third-party breach of contract claims were not barred, there would be no genuine dispute as to any material fact because, as discussed above, Plaintiffs have not established a fact in dispute as

to the Pumps' defectiveness.  See, e.g., Kuzmech, 2012 WL 6093898, at **13-14

(finding CUTPA claim excluded under the CPLA's exclusivity clause and stating

even if it were not excluded, no viable CUTPA claim would exist as plaintiff did

not sufficiently assert the product's defectiveness).

>   v.  **WPCA's Damages**

Finally, Flowserve asserts that if any of WPCA's claims against it survive,

the Court should give effect to its limitation of liability clause, and WPCA's

damages should be capped at the cost of the six Pumps.  [Dkt. 129 at 37-38.]

Although the Court has found, for the reasons set forth above, that WPCA's

claims against Flowserve are not viable, the Court finds the limitation of liability

clause would be enforceable to limit any judgment against Flowserve.

As discussed above with respect to Flowserve's warranty provisions,

"parties are . . . free to shape their remedies to their particular requirements and

reasonable agreements limiting or modifying remedies are to be given effect."

Comind, Companhia de Seguros, 116 F.R.D. at 412 (citing comment to Conn. Gen.

Stat. § 42a-2-719)).  Parties may contract to limit available damages for breach,

"but only at an amount which is reasonable in the light of the anticipated or

actual harm caused by the breach, the difficulties of proof of loss, and the

inconvenience or non-feasibility or otherwise obtaining an adequate remedy."

Conn. Gen. Stat. § 42a-2-718(1); see also Conn. Gen. Stat. § 42a-2-719 (stating

consequential damages may be limited or excluded unless that limitation or

exclusion is unconscionable).

Here, the contract limits Flowserve's liability to the "contract price of the specific equipment or service which gives rise to the claim," whether the claim is based on "contract, warranty, tort (including negligence), indemnity, strict liability or otherwise" and whether the damage is "incurred by Gilbane Building Company or any third party." [Dkt. 120-19 at 3.] WPCA again asserts it did not give Gilbane authority to negotiate this contract term. For the reasons set forth above, the Court finds Gilbane did have such authority. Moreover, the Court finds the limitation of liability clause reasonable and enforceable, as the clause provides for liability up to the full price of the Pumps. Compare with Comind, Companhia de Seguros, 116 F.R.D. 397, 415 (finding a limitation of liability unreasonable where it only allowed for recovery of 1/16[th] of the cost of the product in question).

### D. Analysis: Gilbane's Motion for Summary Judgment against WPCA

Count Eight of WPCA's Third Amended Complaint alleges breach of contract against Gilbane; Gilbane seeks summary judgment on that count. [Dkt. 119.] Count Eight alleges that the Construction Management Contract between Gilbane and WPCA created a fiduciary relationship between the parties, and asserts Gilbane breached that fiduciary duty by allowing Flowserve to negotiate beneficial warranty and limitation of liability terms. [Dkt. 72 (Third Amended Complaint).]

"Under Connecticut law, the elements of a breach of contract action are: (a) the formation of an agreement, (b) performance by one party, (c) breach of the agreement by one party, and (d) damages." SV Special Situations Master Fund Ltd. v. Knight Libertas, LLC, No. 3:08-CV-1769 SRU, 2011 WL 2680832, at *10 (D.

Conn. July 8, 2011) (citing Steward Mach. Co., v. White Oak Corp., 462 F.Supp.2d 251, 265 (D. Conn. 2006)).  The party alleging the breach must also establish that the breach caused its damages.  Collins v. Anthem Health Plans, Inc., 275 Conn. 309, 333 (2005).

Any contract "must be construed to effectuate the intent of the parties, which is determined from the language used and interpreted in the light of the situation of the parties and the circumstances connected with the transaction." Murtha v. City of Hartford, 303 Conn. 1, 7–8 (2011) (quoting Remillard v. Remillard, 297 Conn. 345, 355 (2010)); Harbour Pointe, LLC v. Harbour Landing Condominium Ass'n, Inc., 300 Conn. 254, 260 (2011) ("In ascertaining the contractual rights and obligations of the parties, we seek to effectuate their intent, which is derived from the language employed in the contract, taking into consideration the circumstances of the parties and the transaction.").  Where the language of a contract is unambiguous, a court "must give the contract effect according to its terms."  Harbour Pointe, 300 Conn. at 260 (quoting Cantonbury Heights Condominium Ass'n Inc. v. Local Land Dev., LLC, 273 Conn. 724, 734–35 (2005)).

Here, the contract term allegedly breached created a fiduciary duty between Gilbane and WPCA.  "The essential elements [of] a cause of action for breach of fiduciary duty under Connecticut law are: 1. That a fiduciary relationship existed which gave rise to (a) a duty of loyalty on the part of the defendant to the plaintiff, (b) an obligation on the part of the defendant to act in the best interests of the plaintiff, and (c) an obligation on the part of the

defendant to act in good faith in any matter relating to the plaintiff; 2. That the

defendant advanced his or her own interests to the detriment of the plaintiff; 3.

That the plaintiff sustained damages; 4. That the damages were proximately

caused by the fiduciary's breach of his or her fiduciary duty." **Godina v. Resinall**

**Int'l, Inc., 677 F. Supp. 2d 560, 575 (D. Conn. 2009) (VLB).** "[A] fiduciary or

confidential relationship is characterized by a unique degree of trust and

confidence between the parties, one of whom has superior knowledge, skill or

expertise and is under a duty to represent the interests of the other." **Sherwood v.**

**Danbury Hosp., 278 Conn. 163, 195, 896 A.2d 777 (2006)** (quoting **Biller Assocs. v.**

**Peterken, 269 Conn. 716, 723, 849 A.2d 847 (2004)).**

Here, the Construction Management Contract created the following

fiduciary duty:

> By virtue of entering this agreement, the parties hereto enter a
> fiduciary relationship characterized by a unique degree of trust and
> confidence between the parties based upon [Gilbane's] superior
> knowledge, skill and expertise in the Project's design and
> construction. [Gilbane] accepts the relationship of trust and
> confidence established by this Agreement and covenants to perform
> its services in cooperation with [CDMS] in order to further the Project
> and the interests of the WPCA.

[Dkt. 120-4 at 4.] The Construction Management Contract also outlines Gilbane's

duty to negotiate bids from subcontractors:

> [Gilbane] shall obtain competitive bids . . . as needed, for the Work in
> accordance with all applicable bidding procedures, requirements,
> laws and regulations. It is the responsibility of [Gilbane] to prepare
> and package all . . . bid documents. These documents shall include,
> but not be limited to, drawings and specifications, a phasing plan, a
> safety plan, all state and local bid requirements and state prevailing
> wage rates. Draft bid documents that include all contractual terms
> and other requirements governing the hiring of labor and purchasing
> of materials in connection with the Work that must be included

within the Trade Contract will be provided by the City of Norwalk Purchasing Department. [Gilbane] is responsible for supplementing the bidding documents and making any and all necessary revisions in order for such documents to be appropriate in form and content for public bidding purposes. After receiving and analyzing such bids, [Gilbane] shall deliver all of the bids to the WPCA and [CDMS]. [Gilbane] shall then determine, with the reasonable advice of the WPCA and the Engineer, which bids will be accepted for the Project as being the lowest, responsive and responsible bid.

[Dkt. 120-4 at 5.]

The Construction Management contract satisfies the first element of a claim for breach of fiduciary duty: Gilbane owed WPCA a duty of trust and confidence, and was obligated to act in a way that furthered WPCA's interests. [Dkt. 120-4 at 4]; Godina, 677 F. Supp. 2d at 575. However, WPCA has offered no evidence as to the second element of breach of fiduciary duty; there is no evidence that Gilbane advanced its own interests by negotiating Flowserve's contract terms. WPCA posits that Gilbane may have negotiated for Flowserve to provide sensors not originally included in its bid package in exchange for warranty and limitation of liability terms, but cites no record evidence in support of that theory. Such speculative assertions do not create a material question of fact precluding summary judgment. Gottlieb v. County of Orange, 84 F.3d 511, 518 (2d Cir. 1996) (stating a party may not rely on conclusory assertions to defeat summary judgment); see also, e.g., Stevens v. Landmark Partners, Inc., 2012 WL 13026653, at *10 (D. Conn. July 27, 2012) (finding no breach of fiduciary duty where the plaintiff asserted, without factual support, that the defendant acted in a way that furthered his own personal interests). Accordingly, as WPCA has not provided evidentiary support for its claim that Gilbane breached its contracted-for

fiduciary duty, WPCA cannot establish its breach of contract claim, and Gilbane's motion for summary judgment must be granted.

Further, even if WPCA had offered evidence that Gilbane advanced its own interests by negotiating Flowserve's contract terms, which it has not, WPCA certified Flowserve's bid to the Clean Water Fund, and that certified bid included Flowserve's limitation of liability and warranty language. [Dkts. 120-38; 150 at 6-7.] The limitation of liability and warranty language was clear and conspicuous. *Id.* As such, WPCA has not offered evidence that Gilbane had "superior knowledge" of Flowserve's limitation of liability and warranty language, and has not established that it reasonably relied on Gilbane to negotiate terms other than what WPCA certified. *Sherwood*, 278 Conn. at 195 (explaining that a fiduciary duty must be characterized by a "unique degree of trust and confidence" which is created when a party has "superior knowledge, skill or expertise") (quoting *Biller Assocs.*, 269 Conn. at 273); *Conte v. U.S. Alliance Fed. Credit Union*, 303 F. Supp. 2d 220, 227 (D. Conn. 2004) (finding a fiduciary duty exists where a party "reposed confidence in another and reasonably relied on the other's superior knowledge"). Gilbane was not in a "dominant" position with "great opportunity for abuse of the confidence reposed in him," rather, the terms Gilbane negotiated were reviewed by WPCA. Moreover, it was WCPA and not Gilbane which made the ultimate decision to accept the terms. *Cadle Co. v. D'Addario*, 268 Conn. 441, 455 (Conn. 2004). The lack of evidence that Gilbane possessed superior knowledge of the contract terms, as well as the lack of evidence that Gilbane

negotiated the terms in its own interests, compels the Court to grant Gilbane's motion for summary judgment.

### E.    Analysis: Gilbane and Flowserve's Motions for Summary Judgment as to Indemnity and Contribution

Gilbane and Flowserve have also each moved for summary judgment as to contribution and indemnification claims against each other, in the event that WPCA's claims against either entity were found meritorious.  These claims are moot in light of the Court's rulings above dismissing WPCA's claims against Gilbane and Flowserve.  Russman v. Bd. of Ed. of Enlarged City Sch. Dist. of Watervliet, 260 F.3d 114, 118-19 (2d Cir. 2001) (explaining that a dispute before a court must be "real and live, not feigned, academic, or conjectural," and if a "dispute should dissolve at any time due to a change in circumstances, the case becomes moot").  Even so, the Court notes that under the contract between Gilbane and Flowserve, Flowserve agreed to:

> indemnify and save Gilbane Building Company ("Indemnitee") harmless from any and all liability, expense, costs, damages, and/or losses of any kind ("Claims") arising out of injuries to any person or persons (including death) or loss of or damage to property including the property of Indemnitee, arising out of the purchase of the goods and/or services, to the extent caused by [Flowserve's] negligence or willful misconduct.

[Dkt. 125-10 at 2.]

WPCA alleged that Flowserve negligently designed the Pumps.  Under the parties' indemnification clause, Flowserve would have been required to indemnify Gilbane for any judgment against it arising out of that alleged negligence.  See Comind, Companhia de Seguros, 116 F.R.D. at 412 (stating courts give effect to

parties' reasonable agreements limiting or modifying remedies).  However, as previously stated, as the Court has dismissed WPCA's claims against Flowserve and Gilbane, Flowserve and Gilbane's motions for contribution and indemnification as to any judgment rendered in WPCA's favor are moot.

**F.**    **Analysis: Flowserve's Motion for Summary Judgment against Gilbane for Breach of Contract**

Lastly, Flowserve asserts summary judgment should be granted in its favor as to Count One of its Third-Party Complaint against Gilbane, which claims breach of contract.  [Dkt. 30 (Third-Party Complaint); Dkt. 124 (Motion for Summary Judgment).]

As stated above, the elements of a breach of contract action are (1) the formation of an agreement; (2) performance by one party; (3) breach of the agreement by the other party; and (4) damages.  Empower Health LLC, 2011 WL 2194071 at *4.  The party alleging the breach must also establish that the breach caused its damages.  Collins, 275 Conn. at 333.  Where the language of a contract is unambiguous, a court "must give the contract effect according to its terms." Harbour Pointe, 300 Conn. at 260.

Flowserve bases its breach of contract argument on the limitation of liability clause in its contract with Gilbane, which states "the total liability of [Flowserve] with respect to this Contract, or any breach thereof, whether based on contract, warranty, tort (including negligence), indemnity, strict liability or otherwise, shall not exceed the Contract Price of the specific equipment or service which gives rise to this claim."  Dkt. 120-19 at 1-3.]  Flowserve argues that if it is found liable to WPCA for anything beyond the contract price of the Pumps,

76

Gilbane has breached the limitation of liability provision and is responsible for the excess amount.  [Dkt. 124 at 9.]

Gilbane responds that Flowserve has offered no evidence in support of its claim that the limitation of liability clause created an agreement for Gilbane to repay Flowserve for damages it might incur in the lawsuit brought by WPCA.  [Dkt. 139 at 9.]  To the contrary, Gilbane notes that the agreement requires Flowserve to defend, indemnify, and hold Gilbane harmless from any claims arising out of Flowserve's negligence, errors, acts, or omissions in the performance of design services required under the purchase order.  [Dkt. 125-10 (Purchase Order) at 2.]

As a preliminary matter, Flowserve's motion asserts that Gilbane is liable to Flowserve for breach of contract if Flowserve is found liable to WPCA in an amount above the cost of the Pumps.  Because the Court has granted Flowserve's motion for summary judgment against WPCA, the liability Flowserve contemplated as a predicate to its breach of contract claim against Gilbane has not come to fruition, and this motion is moot.  Russman, 260 F.3d at 118-19.

Second, even if this claim were not rendered moot, the Court finds that Flowserve has not established the elements of breach of contract with respect to Gilbane.  First, the plain meaning of the limitation of liability clause does not create an agreement for Gilbane to repay Flowserve for its potential damages.  Rather, in light of the clause discussed previously which contemplates Flowserve indemnifying Gilbane, the Court would have to "torture" the plain meaning of the contract in order to find Flowserve's proposed agreement.  Harbour Pointe, 300

Conn. at 260 ("The court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity. . . . [T]he mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous.").

Third, even if the Court were to adopt Flowserve's reading of the limitation of liability clause, Flowserve has not offered any evidence purporting to establish that, if Flowserve were found liable to WPCA, it would be the result of a breach by Gilbane. Flowserve has not pointed to any action by Gilbane which constituted a breach of their agreement, but rather asserts in a backward manner that if Flowserve is found liable to WPCA in excess of the amount of the cost of the Pumps, that liability must be the result of an unspecified breach by Gilbane. Such a conclusory assertion not backed by evidence is insufficient to state a viable claim at summary judgment. Gottlieb v. County of Orange, 84 F.3d 511, 518 (2d Cir. 1996) (stating a party may not rely on conclusory assertions to prevail on summary judgment). Flowserve has not established the third element of breach of contract, that Gilbane has breached their agreement, nor has Flowserve asserted that any breach by Gilbane "naturally and directly" caused Flowserve's contemplated injuries. See East Point Sys. v. Maxim, 2016 WL 1118237, at *8 (D. Conn. Mar. 22, 2016) (explaining the causation element of breach of contract). Accordingly, if Flowserve's motion for summary judgment in its favor on its breach of contract claim against Gilbane were not moot, it would be DENIED.

## II. Conclusion

For the foregoing reasons, Flowserve's motions to exclude experts Hodgson and Dickson are GRANTED, Flowserve and Gilbane's motions for summary judgment against WPCA are GRANTED, and Flowserve and Gilbane's motions for summary judgment against each other are found as moot. The Clerk is directed to close this file.

IT IS SO ORDERED.

_____/s/_____

Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut:  March 28, 2018